# 12 CIV 0112

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------- x
MORGAN STANLEY CAPITAL GROUP INC.    :
                                     :
                        Plaintiff,   :
                                     :
       v.                            :   COMPLAINT
                                     :
SWIFT REFINING COMPANY LLC,          :
                                     :
                        Defendant.   :
------------------------------------------------------------- x
```



Morgan Stanley Capital Group Inc. ("Plaintiff" or "MSCG") as and for its Complaint against Swift Refining Company LLC ("Defendant" or "Swift") alleges as follows:

### THE PARTIES

1.      MSCG is a corporation organized under the laws of the State of Delaware with its principal place of business located at 2000 Westchester Avenue, Purchase, New York 10577.

2.      On information and belief, Swift is an Arizona corporation with its principal place of business at 5301 North 16th Street, Phoenix, Arizona 85016.

### SUBJECT MATTER JURISDICTION

3.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) over all claims in this action as they are between citizens of different States and the amount in controversy exceeds $75,000.

### PERSONAL JURISDICTION

4.      Personal jurisdiction over Defendant is proper because the parties agreed to submit to the exclusive jurisdiction of any federal or state court of competent jurisdiction situated in the Borough of Manhattan, State of New York, for any disputes that arise from the Contract

underlying this dispute.  The parties also agreed that any dispute would be covered by and construed in accordance with the laws of the State of New York.

## VENUE

5.     Venue is proper in this judicial district because the parties contractually agreed to submit to the exclusive jurisdiction of the federal or state courts situated in the Borough of Manhattan, State of New York.  Each party further waived to the fullest extent permitted any objection to the jurisdiction of any such court or to the venue therein or any claim of inconvenient forum of such court.

## ALLEGATIONS OF FACT

6.     On or about May 11, 2011, with both parties acting through a broker, Swift as Buyer orally agreed to purchase from MSCG as Seller a cargo of approximately 324,000 barrels of a gasoline blendstock known as "Conventional Blendstock for Oxygenate Blending" ("CBOB"), for delivery on DES, Ex Duty, terms aboard the vessel SEAVICTORY to the Dominican Republic during the period May 15-17, 2011 (hereafter, the "Contract").

7.     On May 12, 2011, MSCG sent its written confirmation of the Contract setting forth in full terms and conditions and incorporating the Morgan Stanley Capital Group, Inc. General Terms and Conditions for the Sale of Crude Oil and Petroleum Products ("GTCs"). (The entire Contract with incorporated GTCs is attached as Exhibit A.)

8.     Swift received the written confirmation and did not object at any time to any of its terms and conditions or any of the terms set forth in that document.

9.     Pursuant to the terms of the Contract, Swift agreed to prepay before delivery on May 12, 2011 a provisional price based on the New York Mercantile Exchange ("NYMEX")

2

Settlement Price on May 11, 2011 for June 2011 RBOB + 10¢ per gallon, with the final price as the NYMEX Settlement Price on May 13, 2011 for June RBOB + 10¢ per gallon.

10.      Pursuant to the Contract, Swift was obliged to make provisional payment by 1300 hours Eastern Standard Time on May 12, 2011 and final payment was to be made no later than 1300 hours Eastern Standard Time on May 16, 2011.

11.      The vessel SEAVICTORY duly arrived within the contractual delivery period and as directed by Swift presented notice of readiness to discharge at the port of Rio Haina in the Dominican Republic.

12.      Despite its contractual obligation, Swift did not make prepayment on or before 1300 hours Eastern Standard Time on May 12.  As a result, MSCG did not permit discharge of the cargo until payment had been received from Swift.

13.      Swift repeatedly represented and promised MSCG that payment would be made and MSCG accordingly instructed the vessel to continue waiting at the port without discharging its cargo.

14.      After numerous delays over many days without receiving prepayment as required by the Contract, MSCG made formal final demand for a prepayment by letter dated May 20, 2011.

15.      Under the GTCs incorporated into the Contract, the failure to make any payment when due under any transaction within one business day following receipt of demand for payment constituted an Event of Default.

16.      Swift failed to remit payment as required under the Contract and the cargo remained on board the vessel SEAVICTORY at the port of Rio Haina, Dominican Republic.

3

17.     On May 26, 2011, MSCG delivered a Notice of Early Termination under the terms of the Contract and thereby MSCG exercised its right to terminate the Contract pursuant to the GTCs of the Contract.  (Attached as Exhibit B.)

18.     Upon termination of the Contract, MSCG undertook all necessary steps to mitigate its damages, including redirecting the vessel to Florida where an active market for sale of CBOB existed.

19.     On September 23, 2011, in accordance with the GTCs incorporated into the Contract, MSCG transmitted to Swift a "Notice of Termination Payment" setting forth its total damages in the sum of $4,920,628.72.  (Attached as Exhibit C.)

20.     Swift has never responded to the Notice of Termination Payment nor made payment as required according to the terms of the Contract.

21.     By reason of its breach of contract, MSCG suffered total damages in the amount of $4,920,628.72.

### FIRST CAUSE OF ACTION (BREACH OF CONTRACT)

22.     Plaintiff repeats and restates the allegations of paragraphs 1 through 21 of the Complaint.

23.     The Contract requires Swift to pay directly to MSCG upon MSCG's first demand any obligation owed by Swift to MSCG.

24.     MSCG made valid written demand on Swift on September 23, 2011 in accordance with the terms of the Contract and the GTCs incorporated therein.

25.     Swift has neither paid the damages demanded by MSCG nor denied the damages.

15407474.2

26.     Swift has breached the Contract by failing to make prepayment or arranging for prepayment of the cargo to enable delivery in the Dominican Republic and has since failed to pay damages when demanded.

27.     MSCG is entitled to all damages plus reasonable attorneys' fees and other damages, costs and expenses incurred by MSCG as a result of Swift's failure to fully and faithfully adhere to the terms of the Contract.

PRAYER

28.     WHEREFORE, MSCG prays for relief as follows:

a.      damages for Defendant's breach of contract in the sum of $4,920,628.72 plus prejudgment interest thereon at the contractual rate;

b.      costs and expenses including reasonable attorneys' fees; and

c.      such other further and different relief as the Court may deem just and proper.

Dated: New York, New York
       January 6, 2012

Respectfully submitted,

**SUTHERLAND ASBILL & BRENNAN LLP**

By:_____
    David P. Langlois
    Peter Ligh
    1114 Avenue of the Americas, 40th Floor
    New York, NY 10036
    (212) 389-5000
    Attorneys for Plaintiff

# EXHIBIT A

**MORGAN STANLEY CAPITAL GROUP INC.**
SALE CONFIRMATION

TO:                 SWIFT REFINING COMPANY, LLC

DATE:               MAY 12, 2011

CONTRACT NO.:       76201986

TRADE DATE:         MAY 11, 2011

BROKER:             MVP-USA


THIS "CONFIRMATION" EVIDENCES THE TERMS OF THE BINDING ORAL AGREEMENT REACHED BETWEEN OUR COMPANIES.

THIS CONFIRMATION, AND MORGAN STANLEY'S GENERAL TERMS AND CONDITIONS EFFECTIVE NOVEMBER, 2008 (THE "GENERAL TERMS"), WHICH ARE INCORPORATED HEREIN, TOGETHER (COLLECTIVELY, THIS "AGREEMENT") CONSTITUTE THE PARTIES' ENTIRE AGREEMENT AS TO THIS "TRANSACTION" AND SUPERSEDES ALL PRIOR COMMUNICATIONS BETWEEN THE PARTIES AND ANY BROKER'S CONFIRMATION. CAPITALIZED TERMS NOT DEFINED IN THIS CONFIRMATION ARE DEFINED IN THE GENERAL TERMS


1.  SELLER:
MORGAN STANLEY CAPITAL GROUP INC.
ATTN: COMMODITIES
2000 WESTCHESTER AVENUE
PURCHASE, NY  10577-2530

2.  BUYER:
SWIFT REFINING COMPANY, LLC
5301 N. 16TH STREET
PHOENIX, AZ 85016
ATTN: LAYMON HARRISON

3.  PRODUCT:
CONVENTIONAL BLEND STOCK FOR OXYGENATE BLENDING

4.  QUALITY:
AS PER ATTACHED LOADPORT SPECS:


**ATTACHED SPECS:**
To : MORGAN STANLEY CAPITAL
GROUP INC., London - Attn. Mr. Barnaby Stubbs

Our Ref. : 380083 1
Subject : MT. SEAVICTORY loaded from shoretanks 1202,1204,1102, 902,103 and MT Torm Aalborg
Destination : New York (for orders)
Product : GASOLINE

Location : Oiltanking, Amsterdam
Berth : 2
Date : 20-30/04/11
message : 380083.110 30/04/11 13:21 SGRJLO

ANALYTICAL RESULTS
==================
A) Sample description :
======================
Following analyses were carried out on upper, middle, lower and two
running samples drawn by us from shoretank 1202 before loading.
Test Method Result
---- ------ -----
Density at 15 deg C,kg/m3 D 4052
upper 743.3
middle 743.3
lower 743.3
Appearance Visual Br. and Cl.
Colour Visual Yellow


B) Sample description :
======================
Following analyses were carried out on upper, middle, lower and two
running samples drawn by us from shoretank 1204 before loading.

Test Method Result
---- ------ -----
Density at 15 deg C,kg/m3 D 4052
upper 731.8
middle 731.8
lower 731.8
Appearance Visual Br. and Cl.
Colour Visual Yellow


C) Sample description :
======================
Following analyses were carried out on upper, middle, lower and two
running samples drawn by us from shoretank 1102 before loading.

Test Method Result
---- ------ -----
Density at 15 deg C,kg/m3 D 4052
upper 751.9
middle 751.9
lower 751.9
Appearance Visual Br. and Cl.
Colour Visual Yellow


D) Sample description :
======================
Following analyses were carried out on upper, middle, lower and two

running samples drawn by us from shoretank 902 before loading.

Test Method Result
---- ------- ------
Density at 15 deg C,kg/m3 D 4052
upper 723.0
middle 723.0
lower 723.0
Appearance Visual Br. and Cl.
Colour Visual White

E) Sample description :
========================
Following analyses were carried out on upper, middle, lower and two
running samples drawn by us from shoretank 103 before loading.

Test Method Result
---- ------- ------
Density at 15 deg C,kg/m3 D 4052
upper 715.9
middle 715.9
lower 715.9
Appearance Visual Br. and Cl.
Colour Visual Yellow

F) Sample description :
========================
Following analyses were carried out on composite sample prepared
from running samples drawn from ship's cargotanks MT Torm Aalborg
(heavy parcel) before discharge.(closed sampling)
Test Method Result
---- ------- ------
Density at 15 deg C,kg/m3 D 4052 736.2
Appearance Visual BR and Cl
Colour Visual waterwhite

G) Sample description :
========================
Following analyses were carried out on composite sample prepared
from running samples drawn from ship's cargotanks MT Torm Aalborg
(light parcel)before discharge.(closed sampling)
Test Method Result
---- ------- ------
Density at 15 deg C,kg/m3 D 4052 655.9
Appearance Visual BR and Cl
Colour Visual waterwhite

H) Sample description :
========================
Following analyses were carried out on proportional handblend

prepared from upper,middle,lower and two running samples drawn from shoretanks 1202,1204,1102,902,103 and running samples drawn from Mt Torm Aalborg before loading.(plus 10% ethanol)

Test Method Result
---- ------ -----

Density at 15 deg C,kg/m3 D 4052 729.0
A.P.I. (clear) D 1298 64.05
Colour Visual undyed
Density at 15 deg C (clear),kg/m3 D 4052 723.4
Copper corrosion 3hrs at 50 deg C D 130 1A
Existent Gum, mg/100ml (wash) D 381 2
Doctor Test IP 30 positive
Mercaptan Sulphur as S,ppm UOP 163 12
Sulphur (clear),mg/kg D 2622 76
Phosphorous,g/gal D 3231 less than 0.0008
Oxidation Stability,mins D 525 more than 360
Research Octane Number D 2699 92.3
Motor Octane Number D 2700 83.1
(RON+MON)/2 calc. 87.7
Benzene,vol o/o D 3606 0.7
MTBE (clear),vol o/o D 4815 less than 0.2
DVPE,psi EPA/D 5191 9.5
Distillation at 760 mmHg D 86
10 o/o evaporated,deg C /deg F 50 / 122
50 o/o evaporated,deg C /deg F 68 / 154
90 o/o evaporated,deg C /deg F 133 / 271

F.B.P.,deg C /deg F 178 / 352
V/L ratio D 4814 52.62
Driveability Index,deg F D 4814 415
Silver corrosion 3hrs at 50 deg C D 4814-2004B 0
Nace corrosion TM0172-2001 A
Oxygen content (clear),wt o/o D 4815 less than 0.2

Precision parameters apply in the determination of above testresults.
Also refer to ASTM D 3244-90A, IP 367 and appendix E of
IP Standard Methods for Analysis and Testing for utilization of
test data to determine conformance with specifications.

Best regards
SGS Nederland B.V.
Oil, Gas & Chemical Services

---

THIS PRODUCT IS CONVENTIONAL GASOLINE AND DOES NOT MEET THE REQUIREMENTS FOR REFORMULATED GASOLINE AND MAY NOT BE USED IN ANY REFORMULATED GASOLINE COVERED AREA.

QUALITY AS PER LOAD PORT VOLUMETRICALLY CORRECT COMPOSITE SAMPLE AT LOAD PORT AS CERTIFIED BY INDEPENDENT INSPECTOR OR RECORD.

5. QUANTITY:
APPROXIMATELY 324,000 BARRELS

QUANTITY BASED ON BILL OF LADING

6. DELIVERY:
INCO TERM:
DES, EX-DUTY, INTO ONE SAFE PORT/BERTH

MODE OF TRANSPORTATION:
VESSEL – SEAVICTORY

LOCATION:
DOMINICAN REPUBLIC

DELIVERY IS BASIS ARRIVAL DRAFT OF 36.5 FEET AND ASSUMED DIRECT DOCK DISCHARGE. ANY COSTS FOR ADDITIONAL WAITING TIME AND/OR LIGHTERING, IN ORDER TO REACH THE DOCK PRIOR TO DISCHARGE OF THE VESSEL, FOR BUYER'S ACCOUNT. ALL NECESSARY LIGHTERING EQUIPMENT (INCLUDING DAUGHTER VESSEL, HOSES), IF APPLICABLE, FOR BUYER'S ACCOUNT – MUST BE CLEARED BY OWNERS

SHOULD THERE BE ANY DELAYS BY THE BUYER OR FAILURE TO MEET BUYER'S OBLIGATIONS, ALL COSTS SHALL BE FOR BUYER'S ACCOUNT

7. DELIVERY PERIOD/TERM:
MAY 15 – 17, 2011

LAYDAYS, LAYTIME AND DEMURRAGE:
PER CHARTER PARTY RATE, TERMS AND CONDITIONS.
PUBLIC DOCK CLAUSE SHALL NOT APPLY.

8. PRICE:
PROVISIONAL PRICE:
THE NEW YORK MERCANTILE EXCHANGE (NYMEX) SETTLEMENT PRICE FOR JUNE 2011 RBOB PLUS USD 0.10 PER GALLON ON MAY 11, 2011.

FINAL PRICE:
THE NEW YORK MERCANTILE EXCHANGE (NYMEX) SETTLEMENT PRICE FOR JUNE 2011 RBOB PLUS USD 0.10 PER GALLON ON MAY 13, 2011.

PRICING DATE IS SUBJECT TO CHANGE IF PREPAYMENT OF PROVISIONAL INVOICE IS NOT MADE BY 13:00 EASTERN STANDARD TIME ON MAY 12, 2011, AS LATER THAN THIS TIME WILL NOT ALLOW TIME FOR SETTLEMENT ORDERS TO BE PLACED.

9. EFP:
THIS CLAUSE DOES NOT APPLY TO THIS CONTRACT.

10. PAYMENT:
PROVISIONAL PAYMENT:
PREPAYMENT OF PROVISIONAL INVOICE BY 13:00 EASTERN STANDARD TIME ON MAY 12, 2011.

FINAL PAYMENT:
FINAL PAYMENT SHALL BE MADE BY 13:00 EASTERN STANDARD TIME ON MAY 16, 2011

11. CREDIT:
PREPAYMENT AS PER CLAUSE 10

12. NOTICES:
ALL INVOICES AND NOTICES GIVEN PURSUANT TO THIS AGREEMENT SHALL BE IN
WRITING AND SHALL BE DEEMED DELIVERED WHEN RECEIVED BY THE OTHER PARTY AT
THE ADDRESS SPECIFIED BELOW:

ALL NOTICES TO MSCGI SHALL BE MAILED OR FAXED AS FOLLOWS:
MORGAN STANLEY CAPITAL GROUP INC.
2000 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577
FAX:     914-750-0486

**CONTRACT MANAGEMENT:**

| CONTACT | PHONE | FAX |
|---|---|---|
| Margaret Keane | 914-225-1672 | 914-750-0486 |

**SCHEDULING CONTACTS:**

**GASOLINE WATERBORNE:**

| | | |
|---|---|---|
| Northeast – Christina Gregor | 914 -225-1678 | 914-225-9299 |
| Southeast- Kathryn Gallagher | 914 225-4804 | 914-225-9299 |

**GASOLINE COMPONENTS:**

| | | |
|---|---|---|
| Northeast – Matt Brewer | 914 225-1411 | 914 225-9299 |
| Gulf Coast – Robert Kirk | 914-225-1467 | 914 225-9299 |

THIS AGREEMENT OR OBJECT TO ANY OF ITS CONTENTS WITHIN TWO (2) BUSINESS DAYS
FROM RECEIPT OF THIS CONFIRMATION. IF YOU DO NOTIFY SELLER OF ADDITIONAL OR
DIFFERENT TERMS FROM THOSE SET FORTH HEREIN WITHIN TWO (2) BUSINESS DAYS OF
RECEIPT OF THIS CONFIRMATION, THOSE TERMS SHALL BE CONSTRUED ONLY AS
PROPOSALS FOR AMENDMENTS TO THIS AGREEMENT AND SHALL NOT BECOME PART OF
THIS AGREEMENT UNLESS EXPRESSLY AGREED TO BY SELLER IN A SUPPLEMENTAL
WRITTEN CONFIRMATION.

WE APPRECIATE THE OPPORTUNITY TO HAVE CONCLUDED THIS BUSINESS WITH YOU.

REGARDS,
MORGAN STANLEY CAPITAL GROUP INC.

**MORGAN STANLEY CAPITAL GROUP INC.**

**GENERAL TERMS AND CONDITIONS FOR THE SALE OF CRUDE OIL AND
PETROLEUM PRODUCTS
Effective November, 2008**

These General Terms and Conditions for the Sale of Crude Oil and Petroleum Products
("GTCs"), together with the special terms set forth in a Confirmation, form the Parties' agreement
as to a Transaction.

## PART I – DEFINITIONS AND GENERAL

### 1. DEFINITIONS

"Acceptable Letter of Credit Issuer" means a U.S. state- or federally-chartered commercial bank or an international commercial bank that is and remains acceptable to Seller, and which has senior unsecured long term debt or deposits that, at the time when the relevant letter of credit is delivered to Seller, are rated at least "A" (or its then current equivalent) by Standard & Poor's Ratings Service (or any successor rating agency thereto) and at least "A2" (or its then current equivalent) by Moody's Investors Service, Inc. (or any successor rating agency thereto).

"Affiliate" means, in relation to any Person, an entity controlled, directly or indirectly, by the Person, any entity that controls, directly or indirectly, the Person or any entity directly or indirectly under common control with the Person. For this purpose, "control" of any entity or Person means ownership of a majority of the voting power of the entity or Person. In respect of MSCG, the term "Affiliate" shall not include Morgan Stanley Derivative Products, Inc.

"**All Fast**" means that the Vessel is completely moored at the Cargo Transfer Point with gangway down and secured.

"API" means the American Petroleum Institute.

"Applicable Law" means (i) any law, statute, regulation, code, ordinance, license, order, writ, injunction, decision, directive, judgment, policy, decree and any judicial or administrative interpretations thereof, (ii) any agreement, concession or arrangement with any Governmental Authority and (iii) any license, permit or compliance requirement, including under any environmental law, in each case as may be applicable to either Party or either Party's performance under any Transaction.

"ASTM" means the American Society of Testing Materials.

"Bankrupt" means, with respect to a Party, its direct or indirect parent companies, Buyer's Credit Support Provider or an Acceptable Letter of Credit Issuer, as the case may be, that such Party or Buyer's Credit Support Provider: (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation; (v) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets; (viii) causes or is subject to any event with respect to it which, under Applicable Law, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive); or (ix) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et. seq.*

"Barrel" means 42 U.S. Gallons measured at a temperature of 60 degrees Fahrenheit (60°F) and an absolute pressure of 29.92 inches of mercury.

"Business Day" means a day on which banks are open for general commercial business in New York, New York.

"Buyer" means the Party purchasing Product from the other Party.

"Cargo" means a shipment of Product that is the subject of a Transaction and that is to be transported by Vessel.

"Cargo Transfer Point" means the place designated in a Confirmation for delivery of the Cargo by one Party to the other Party.

"Confirmation" means a written communication from MSCG confirming the economic and other terms of a Transaction, as may be amended by the Parties' mutual written agreement.

"Credit Support Provider" means the guarantor or other Person providing credit support for Buyer.

"Delivery Location" means the location specified for delivery of Product in a Confirmation.

"Delivery Period" means the period specified for delivery of Product in a Confirmation.

"Designated Event" means (i) the consolidation or amalgamation of a Party with, the merger of a Party with or into, or the transfer of all or substantially all of a Party's assets to, another entity, (ii) the reorganization, reincorporation or reconstitution of a Party into or as another entity, (iii) the acquisition by any Person directly or indirectly of the majority of the beneficial ownership of the Party such that such Person may exercise control of the Party, or (iv) a substantial change in the capital structure of a Party by means of the issuance or guaranty of debt.  For purposes of this definition, the term "Party" includes Buyer's Credit Support Provider, if any.

"DWT" means dead weight ton.

"Exchange of Futures for Physicals" or "EFP" means an exchange of futures contracts for, or in connection with, physical Product pursuant to which the buyer and the seller of the futures contracts are the Seller and Buyer of a quantity of the physical Product (or any derivative, by-product or related Product) approximately equivalent to the quantity covered by the relevant futures contracts.

"Force Majeure" means any cause or event reasonably beyond the control of a Party, including fires, earthquakes, lightning, floods, explosions, storms, adverse weather, landslides and other acts of natural calamity or acts of God; navigational accidents or maritime peril; Vessel damage or loss; strikes, grievances, actions by or among workers or lock-outs, whether or not such labor difficulty could be settled by acceding to any demands of any such labor group of individuals; accidents at, closing of, or restrictions upon the use of mooring facilities, docks, ports, pipelines, harbors, railroads or other navigational or transportation mechanisms; disruption or breakdown of or explosions or accidents to wells, storage plants, refineries, terminals, machinery or other facilities; acts of war, hostilities (whether declared or undeclared), civil commotion, embargoes, blockades, terrorism, sabotage or acts of the public enemy; any act or omission of any Governmental Authority; good faith compliance with any order, request or directive of any Governmental Authority; curtailment, interference, failure or cessation of supplies reasonably beyond the control of a Party; or any other cause reasonably beyond the control of a Party, whether similar or dissimilar to those above and whether foreseeable or unforeseeable, which, by the exercise of due diligence, such Party could not have been able to avoid or overcome.  The term "Force Majeure" expressly excludes (i) a failure of performance of any Person other than the Parties, (ii) the loss of Buyer's market or any market conditions for any Product that are unfavorable for either Party, (iii) the loss of Seller's supply of Product, the failure of Seller's supplier of Product to perform or the depletion of Seller's reserves of Product, (iv) any failure by a Party to apply for, obtain or maintain any permit, license, approval or right of way necessary

under Applicable Law for the performance of any obligation under any Transaction, and (v) a Party's inability to economically perform its obligations under any Transaction.

"Gallon" means a U.S. gallon of 231 cubic inches at 60 degrees Fahrenheit (60°F).

"Governmental Authority" means any foreign or U.S. federal, state, regional, local or municipal governmental body, agency, instrumentality, authority or entity established or controlled by a government or subdivision thereof, including any legislative, administrative or judicial body, or any Person purporting to act therefor.

"Independent Inspector" means a licensed Person chosen by the mutual agreement of the Parties who performs sampling, quality analysis and quantity determination of the Product received or delivered pursuant to a Transaction.

"Interest Rate" means an annual rate (based on a 360-day year) equal to the lesser of (i) two percent (2%) over the prime rate as published under "Money Rates" in the *Wall Street Journal* in effect at the close of the Business Day on which payment was due and (ii) the maximum rate permitted by Applicable Law.

"Laydays" means the period set out in a Confirmation that designates the time period during which a Cargo is scheduled to be loaded or discharged, as the case may be.

"Letter of Credit Default" means the occurrence of any of the following events as to any outstanding letter of credit: (i) the Acceptable Letter of Credit Issuer no longer meets one or both of the criteria of an "Acceptable Letter of Credit Issuer" as defined in these GTCs; (ii) the Acceptable Letter of Credit Issuer fails to comply with or perform its obligations under such letter of credit; (iii) the Acceptable Letter of Credit Issuer disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such letter of credit; (iv) the letter of credit expires or terminates, or fails or ceases to be in full force and effect at any time during the term of any outstanding Transaction or during any period when Seller requires that Buyer maintain the letter of credit; (v) Buyer fails to cause a renewal or replacement letter of credit to be delivered to Seller at least 15 Business Days (or by such other date required by Seller) prior to the expiration of such letter of credit; or (vi) the Acceptable Letter of Credit Issuer becomes or is Bankrupt.

"LPGs" means liquefied petroleum gases.

"MPMS" means the API Manual of Petroleum Measurement Standards as amended from time to time.

"MSCG" means Morgan Stanley Capital Group Inc.

"NGLs" means natural gas liquids.

"NOR" means a notice of readiness that is valid and applicable.

"OBQ" means onboard quantity.

"Offsetting Transactions" means any two or more Transactions in respect of the same Product having the same or overlapping Delivery Period(s) (as specified in the Transaction), Delivery Location and payment date, where under one or more of such Transactions, one Party is Seller and under one or more of the other such Transactions the same Party is Buyer.

"Other Commodity Agreement" means any agreement between the Parties (other than a Transaction) to purchase, sell or exchange commodities, including any spot or forward contract, future, option, swap, swap option, cap, floor or collar or other derivative transaction on or with respect to a commodity or any combination of these transactions.

"Party" or "Parties" means Buyer and Seller individually or collectively, as the case may be, in connection with a Transaction.

"Performance Assurance" means cash, an irrevocable standby letter of credit issued or confirmed by an Acceptable Letter of Credit Issuer and that is in a form that complies with the requirements of these GTCs and is for a term acceptable to Seller, a guaranty, or another form of assurance acceptable to Seller.

"Person" means any individual, sole proprietorship, partnership, joint venture, limited liability company, trust, unincorporated organization, association, corporation, institution, entity, party, Governmental Authority, court or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Product" means a refined petroleum product, condensate, crude oil, NGLs, LPGs, ethanol, biodiesel or mixtures thereof and any other like commodity that is the subject of a Transaction.

"RBOB" means reformulated blendstock for oxygenate blending.

"RINs" means renewable identification numbers that are unique numbers generated to represent a volume of renewable fuel pursuant to 40 CFR § 80.1125 and 40 CFR § 80.1126.

"ROB" means the quantity remaining on board.

"Seller" means the Party selling Product to the other Party.

"Taxes" means any and all foreign, federal, state and local taxes, duties, fees and charges of every description, including all motor fuel, excise, gasoline, aviation fuel, special fuel, diesel, environmental, spill, gross earnings or gross receipts and sales and use taxes, however designated, paid or incurred with respect to the purchase, storage, exchange, use, transportation, resale, importation or handling of the Product; provided, however, that "Taxes" does not include: (i) any tax imposed on or measured by net profits, gross or net income, or gross receipts (excluding, for the avoidance of doubt, any transaction taxes such as sales, use, gross earnings or gross receipts or similar taxes that are based upon gross receipts, gross earnings or gross revenues received only from the sale of petroleum products); (ii) any tax measured by capital value or net worth, whether denominated as franchise taxes, doing business taxes, capital stock taxes or the like; and (iii) business license or franchise taxes or registration fees.

"Terminal Operator" means the legal entity, which at the time of loading or discharging of Cargo, is the operator of the loading or discharging facilities at which the Product is loaded or discharged or is to be loaded or discharged.

"Trade Date" means the moment on a particular date when the Parties agree orally or otherwise upon the economic terms of a Transaction or, with respect to any Transaction that is amended, when the Parties agree upon the amendments.

"Transaction" means an agreement between the Parties to buy or sell Product.

"ULSD Regulations" means the EPA Ultra Low Sulfur Diesel regulations, 80 CFR § 500 *et seq.*

"VEF" means Vessel experience factor, always qualified and consistent with current API standards.

"Vessel" unless otherwise indicated, means a tanker or barge employed for the purpose of transporting Product.

## 2.  GENERAL

    **2.1    Interpretation.**  All headings in these GTCs are intended solely for convenience of reference and shall not affect the meaning or interpretation of these GTCs.  Unless expressly provided otherwise, (i) all references to paragraphs, provisions and sections in these GTCs are to the paragraphs, provisions and sections of these GTCs, (ii) the

word "including" shall be read to be followed by the words "without limitation," (iii) the words "other" and "otherwise" shall not be construed as being limited by the context in which they appear or the words that precede them, (iv) references to "consent" mean the prior written consent of the relevant Party, which shall not be unreasonably withheld, delayed or conditioned, (v) when a Party's response is required pursuant to these GTCs within a specific time period following receipt of notice or documentation, as applicable, the day of receipt thereof by such Party shall be considered day zero, (vi) each reference to a "day" or a "month" means a calendar day or a calendar month, respectively, (vii) all terms defined in the singular have the same meanings when used in the plural and *vice versa*, and (viii) all references to Applicable Law are as such Applicable Law may be enacted or amended from time to time. The latest version of Incoterms as published by the International Chamber of Commerce is incorporated into these GTCs.

2.2   **Single Agreement.**   The Parties may from time to time enter into Transactions to purchase or sell Product, which shall be governed by these GTCs. All Transactions shall be entered into in reliance on the fact that all Transactions form a single agreement.

2.3   **Oral Agreements.**  The Parties shall be deemed to have entered into a Transaction, and a Transaction shall become effective and binding upon the Parties, upon the applicable Trade Date.

2.4   **Priority of Terms.**   In the event of any inconsistency between the terms of a Confirmation and the terms of these GTCs, the Confirmation shall govern the relevant Transaction.

2.5   **Recording.**  Each Party consents to the other Party recording conversations between and among their trading and marketing personnel regarding any Transaction. Each Party shall have notified its trading and marketing personnel of such recording and shall have obtained their consent to such recording, if required by Applicable Law.

2.6   **Qualified Financial Contract.**  Each Transaction and Confirmation is deemed to be a "qualified financial contract" within the meaning of New York General Obligations Law § 5-701b.

## PART II – TERMS IN RESPECT OF FOB DELIVERIES

## 3.   TITLE AND RISK OF LOSS

3.1   **FOB.**

(a)  For FOB Vessel Transactions, title to and risk of loss of the Product shall pass from Seller to Buyer as the Product passes the last permanent flange connection between the cargo intake manifold of the Vessel and the delivering hose at the loading terminal.

(b)  For FOB truck and rail Transactions, delivery of the Product shall be made to Buyer at Seller's designated truck or rail loading terminal. Title and risk of loss shall pass from Seller to Buyer as the Product passes the last discharge flange of Seller's loading facility and into Buyer's designated trucks and/or railcars.

(c)  For FOB tank-to-tank transfers or pumpovers, title and risk of loss shall pass from Seller to Buyer as the Product passes the outlet flange of Seller's storage tank.

3.2   **FIP**.  For pipeline Transactions, title and risk of loss shall pass from Seller to Buyer as the Product passes the downstream flange of the meter measuring receipt of Product upon intake.

3.3   **Stock (In-Tank) Transfers.**  When delivery of Product is by stock transfer (where physical inventory is transferred on the books and records of a terminal or pipeline operator from Seller to Buyer), title to and risk of loss of the Product shall pass from Seller to Buyer, unless otherwise agreed or indicated on the documentation issued by the Terminal Operator, at 00:01 on the effective date of transfer as mutually agreed between the Parties.

3.4   **Pipeline Tariff Recovery.**  With respect to pipeline deliveries of Product, in the event that Buyer and Seller agree that Seller shall deliver Product from the relevant pipeline at a location other than the Delivery Location, then (i) in the event such delivery results in increased transportation costs for Seller, Buyer agrees to pay Seller, for the volume delivered, the pipeline tariff differential between the Delivery Location and the actual delivery point, based on the applicable pipeline tariff tables in effect for such pipeline on the date of delivery, or (ii) in the event such delivery results in reduced transportation costs for Seller, then Seller shall, for the volume delivered, reduce the amount due under the applicable invoice for such delivery by an amount equal to the pipeline tariff differential between the Delivery Location and the actual delivery point, based on the applicable pipeline tariff tables in effect for such pipeline on the date of delivery.

## 4.   QUANTITY, QUALITY AND INSPECTION

4.1   **Inspection.**  The quantity and quality of the Product sold under a Transaction shall be determined by an Independent Inspector, whose determinations shall be conclusive and binding upon both Parties, absent fraud or manifest error.  The cost of the Independent Inspector's services shall be shared equally between the Parties.  Seller may have a representative present at the time of title transfer and Buyer shall always provide Seller with free access to ship and shore facilities.  The Parties shall instruct the Independent Inspector to obtain and retain appropriate samples of the Product for a period of 90 days from the date of measurement.

(a)   FOB Vessel Deliveries.  The quantity of Product supplied shall be based on static shore tank measurements taken prior to and after loading of Buyer's Vessel according to the latest API standards.  The quality of Product shall be based on analysis performed using shore tank composite samples taken prior to loading.  If shore tanks are active at loading, quantity shall be determined by Vessel figures (*i.e.*, closing ullages less OBQ adjusted by VEF).  Such VEF shall be determined in accordance with the latest API standards.  Any circumstance relating to quantity shall be governed by current API standards.  Any circumstance relating to quality shall be governed by current API/ASTM standards.

(b)   Pipeline Transactions.  The quality of Product shall be in accordance with the specifications set forth by the relevant pipeline.  Quantities shall be determined by pipeline meter tickets based on calibrated pipeline meters or if such meters are unavailable, by calibration tables, or based on book, stock or inventory transfer.

(c)   Truck and Rail Transactions.  The quality of Product shall be based on shore tank composite samples taken prior to loading as evidenced by the Independent Inspector's report according to ASTM/API industry standards.  The quantity of

Product shall be determined using terminal tank gauges or weigh scales and evidenced by bill of lading(s) or based on book, stock or inventory transfer.

**4.2**  *Railcar Demurrage and Detention.*

    (a) *For the purpose of detention, time shall start at the first 00:01 after the railcars are constructively placed at the disposal of Seller. For the purpose of detention, time shall end when all loaded railcars are made available at the loading terminal for collection by, or on behalf of, Buyer. Seller shall be responsible for demurrage and detention charges (as applicable) to the extent it delays loading of the railcars.*

    (b) *Detention charges shall not apply to the first five days of delay. The demurrage charges shall be as per the applicable railroad tariff and the detention charges shall be as per the railcar lease rate.*

**4.3**  **Odorant.** NGLs sold under any Transaction are intended for further processing and no further odorization is required unless Buyer notifies Seller otherwise. Buyer shall indemnify Seller for any liabilities that result from the NGLs not being odorized when Buyer has failed to notify Seller that odorants should be added. Seller shall indemnify Buyer for any liabilities that result from the NGLs not being odorized when Buyer has notified Seller that odorants should be added and Seller fails to do so.

**4.4**  **Claims.** Any claim regarding the quality or quantity of Product delivered shall be deemed waived unless submitted to Seller in writing, together with supporting documentation and reasonable details of the facts on which the claim is based, within 30 days from the title transfer date of such Product.

## 5.  NOMINATIONS, LAYDAYS, LAYTIME AND DEMURRAGE

**5.1**  **Vessel Nomination.** Not less than seven days before a tanker's arrival or four days before a barge's arrival at the Cargo Transfer Point, Buyer shall nominate for Seller's acceptance the Vessel that will load the Cargo. Buyer shall at the same time provide all Vessel data necessary to evaluate acceptability of the Vessel, including Vessel particulars, construction, dimensions, equipment, licenses, classification and all other information as may be required by Seller and such other data or documents as Seller may from time to time require. Buyer also shall at the same time advise whether lightering is contemplated (for Buyer's account) for the Vessel to reach a safe arrival draft.

**5.2**  **Vessel Acceptance.** At the time Seller is first notified of the Vessel nomination, Seller shall have the right to reject that Vessel if, in Seller's sole opinion, such Vessel is unacceptable. Notice of acceptance or rejection of the nominated Vessel shall be communicated to Buyer as soon as possible but always within 48 hours, excluding Saturdays, Sundays and holidays, after Seller's receipt of the nomination and all required data. Acceptance of any Vessel shall not constitute a continuing acceptance of *such* Vessel for any subsequent loading, or in the event of changed or incorrect information. Each Cargo loading requires separate Vessel approval. If the Cargo Transfer Point is a marine terminal with smaller berths for barges, Seller may reject a barge nomination if the nominated barge does not comply with the size requirements of the barge berths.

**5.3**  **Vessel Substitution.** If a Vessel nomination is rejected by Seller, Buyer is obligated to nominate another, suitable Vessel for Seller's acceptance as provided in these GTCs. If

a Vessel nomination is accepted by Seller, Buyer may substitute another Vessel by nominating it for Seller's acceptance. Nomination of a substitute Vessel shall be made no later than four days before the Vessel's arrival at the Cargo Transfer Point. A Vessel nomination that has been accepted by Seller is not superseded until a substitute Vessel nomination has been accepted by Seller.

5.4 **ETAs.** Buyer shall notify Seller in writing by facsimile, letter or other writing of the Vessel's estimated time of arrival ("ETA") at the Cargo Transfer Point. Such notice must be received by Seller at least seven days in advance of such arrival by a tanker or four days in advance of such arrival by barge, or within 24 hours after the Vessel has sailed from the last port before arriving at the Cargo Transfer Point, whichever date is earlier. Buyer also shall provide the Vessel's ETA in writing 72, 48, 24 and six hours before the Vessel's expected arrival at the Cargo Transfer Point. Buyer promptly shall notify Seller in writing if the ETA changes by more than two hours following the 24-hour notice.

5.5 **Additional Pre-Arrival Information.** Buyer shall have a continuing obligation to provide immediate notice to Seller in the event of any change in the data or information provided with the Vessel nomination. The foregoing shall not relieve Buyer of its obligation to provide Seller with all additional data and information not specifically requested by Seller concerning the Vessel's Cargo-worthiness, seaworthiness, safety, suitability for the intended loading or carriage, or with respect to the Vessel's compliance with applicable environmental or safety requirements. Buyer promptly shall update Seller upon discovery of any Vessel problems or deficiencies that may adversely impact operations at the Cargo Transfer Point.

5.6 **Terminal Regulations.** A Vessel must comply at all times with the applicable terminal regulations. Seller shall provide or cause to provide copies of such regulations on request.

5.7 **Laydays.** The Laydays in the relevant Confirmation constitute a window for arrival of the Vessel at the Cargo Transfer Point. If the Vessel arrives within the Laydays, it is anticipated that loading of the Cargo may not be completed before the Laydays expire.

5.8 **Dock Clauses.**

(a) Arriving Vessels. Arriving Vessels shall be placed in a queue and berthed on a first come-first served basis. Seller generally shall take Vessels into berth at the Cargo Transfer Point in the same chronological order as Seller's receipt of NORs, provided, however, that if the Cargo Transfer Point has special barge berths, barges shall use barge berths rather than ocean tanker dock berths. Seller reserves the right, in its sole discretion, to take one or more later arriving Vessels out of sequence, in which event all delay thereby caused in berthing the Vessel shall count as laytime or time on demurrage.

(b) Tardy Arrival. Time is of the essence in each Transaction. Anything to the contrary notwithstanding, Seller may, at its sole option, and without prejudice to its other rights and remedies, reject any Vessel which arrives at the Cargo Transfer Point after Laydays have expired.

(c) Tardy Vessel Berthing. A Vessel which fails to arrive within four hours after the time designated by Seller for its berthing, as assigned within an immediately preceding 24-hour period, shall lose its place in the queue and shall be re-assigned a new time for berthing at Seller's sole discretion, with all expenses and time during the ensuing delay to be for Buyer's account.

**5.9**  **Notice of Readiness, Lightering and Calculation of Laytime.**

(a) <u>Notice of Readiness</u>.  After the Vessel has arrived at the customary anchorage for the Cargo Transfer Point, and is in all respects ready to proceed with loading the Cargo, Buyer shall give NOR to Seller by facsimile, letter, telegraph, wireless, radio telephone or telephone, berth or no berth.  If NOR is given orally, confirmation in writing shall be made promptly.

(b) <u>Laytime</u>.  Total laytime shall consist of the allowed time day or night as set forth below for loading, including Saturdays, Sundays and holidays.

    (i) <u>All Vessels (Other Than Barges Under 16,000 DWT)</u>.  Laytime shall not commence until NOR is tendered, nor prior to 06:01 on the first Layday, <u>provided</u>, <u>however</u>, that if the Vessel is berthed prior to the first Layday with Seller's consent, laytime shall commence when the Vessel is All Fast.  For NOR tendered within the Laydays, laytime shall commence six hours after tender of NOR or when the Vessel is All Fast, whichever occurs first.  Laytime for a Vessel that tenders NOR after expiration of the Laydays shall commence only when the Vessel is All Fast.

    (ii) <u>Barges Under 16,000 DWT</u>.  Laytime for barges under 16,000 DWT shall be based on charter party rates, or if owned equipment or time chartered equipment, laytime shall be based on the number of hours, and the pumping rate in Barrels per hour ("<u>BPH</u>"), as set forth below:

U.S. Gulf/Miss. River Inland Barges (any lot size):

LOADING:  3hrs + 3,000 BPH

Other Barges under 16,000 DWT:

| CARGO LOT SIZE | LOADING |
|---|---|
| Up to 50,000 bbls | 3,000 BPH |
| 50,001 to 90,000 bbls | 4,000 BPH |
| 90,001 to 120,000 bbls | 5,000 BPH |
| 121,000 to 180,000 bbls | 24 hrs |
| more than 180,000 bbls | 30 hrs |

In all cases a minimum laytime of 12 hours shall be allowed on all Cargo transfers, including in cases of part Cargo apportionment if applicable.

(c) <u>Lightering and Topping-Off</u>.  In the event lightering part of the Cargo or topping-off is ordered by Seller, whether the relevant Vessel is anchored, adrift, or underway, and whether it is in or near a port or at a customary lightering position or anchorage for a port, or otherwise on an approach to or departure from and within 100 miles of a port where a Cargo Transfer Point is located, the place of lightering and topping-off shall not count as a separate port or separate berth, regardless of the origin or destination of the lighters.  Laytime for the lightering/topping-off location shall commence upon receipt of NOR and continue until hoses are disconnected.

(d) <u>Tankers and Barges Over 16,000 DWT</u>.  Thirty-six running hours shall be permitted to Seller as laytime at the relevant Cargo Transfer Point for a full Cargo, and a pro rata thereof for part Cargo based on the total volume of Cargo carried by the Vessel on that voyage, <u>provided</u>, <u>however</u>, that laytime shall not be less than 12 hours for a part Cargo.  Buyer warrants that the Vessel is capable of receiving or

discharging its entire Cargo within 24 hours, or maintaining 100 psi at the ship's rail during discharge, provided that Seller's facilities or the facilities used by Seller permit. In the event the Vessel fails to meet the aforementioned criteria, any time consumed in receiving or pumping Cargo in excess of 24 hours or pro rata, as adjusted for crude oil washing ("COW"), shall not count as laytime or time on demurrage. An additional three hours shall be added to the pumping time warranty for each additional Cargo Transfer Point.

(e) Part Cargo Apportionment. Whenever a Transaction covers a Cargo that is among other cargoes to be loaded or discharged by the Vessel at the same port, and the Vessel is waiting on berth or is diverted on account of ice or other risks for which diversion is authorized, then laytime and time on demurrage during the delay shall be apportioned on the basis of the ratio of the volume of the relevant Cargo to the total volume of all such affected cargoes. All time used in loading or discharge of the other cargoes shall be excluded from laytime and time on demurrage under the relevant Transaction. Laytime and time on demurrage during periods of concurrent cargo handling shall be apportioned based on the ratio of the volume of the relevant Cargo to the total volume of all such cargoes subject to concurrent cargo handling and additionally, subject to the 12-hour minimum set forth in the preceding paragraph (d) of this "Notice of Readiness, Lightering and Calculation of Laytime" section.

(f) Shared Delays. Whether or not already on demurrage, laytime and time on demurrage shall accrue at one-half rate in the event and during the term of a "Force Majeure" event as described in these GTCs.

(g) Laytime Exclusions. Time shall not count as laytime or time on demurrage if lost:

    (i) due to inability of the Vessel to safely discharge or receive Cargo within the time allowed;

    (ii) due to the Vessel requiring separate and/or additional shore tank gauges for any reason or the Vessel's failure to comply with terminal regulations, or interruption of transfer operations as a result of Buyer's requests for line fill checks by comparing intermediate ship and shore gauges;

    (iii) due to prohibition of Cargo transfer at any time by the Vessel, Buyer, the owner or operator of the Vessel or by port authorities, unless such prohibition is caused by Seller's failure to comply with Applicable Law;

    (iv) due to Buyer's failure to have required documentation;

    (v) while awaiting customs and immigration clearance and free pratique;

    (vi) due to strike, lockout, stoppage or restraint of labor of the master, officers and crew of the Vessel or towboat or pilots;

    (vii) during any delay for which Buyer, the Vessel, her master or crew is responsible, including any delays caused by any failure of the Vessel to meet the requirements of these GTCs or a Transaction;

    (viii) during bunkering;

    (ix) in reaching a berth due to conditions not reasonably within Seller's control, including weather delays, fog, channel blockage, or awaiting daylight, pilots, tugs and tide;

(x) on an inward passage from a lightering or waiting area to the customary anchorage or berth, and in shifting from the customary anchorage to the berth;

(xi) as a result of a boycott arising in connection with the business of the Vessel or Buyer, the terms or conditions of employment of the Vessel's crew or agents, employment, trades, or cargoes of the Vessel;

(xii) due to restraint or interference in the Vessel's operation by any Governmental Authority in connection with the ownership, registration, or obligations of Buyer or the Vessel, or in connection with stowaways or with smuggling or other prohibited activities of the Vessel's crew or agents;

(xiii) due to Cargo contamination or damage caused by unseaworthiness of the Vessel or negligence of the Vessel or the Vessel's crew or agents; or

(xiv) due to Vessel's unclean tanks, or inability to maintain heating or pumping warranties, or the need for Vessel repairs.

If as a result of such causes and events the Vessel loses its turn to berth, laytime and demurrage shall be suspended until it reberths All Fast. If such causes or events occur while the Vessel is in berth, extra expenses thereby incurred by Seller in connection with the Vessel remaining at the berth shall be for Buyer's account, and Seller also shall have the option to order the Vessel out of berth, so as to avoid delay to other vessels waiting to use the berth, with the cost of unberthing and reberthing for this purpose to be for Buyer's account. Time lost between berthings shall not count as laytime or time on demurrage.

(h) <u>Laytime Ends</u>. For tankers, laytime shall cease upon disconnection of hoses after all Cargo has been loaded, or one hour after all Cargo has been loaded, whichever occurs first. Seller shall be allowed two hours of free time to deliver Cargo documents to the Vessel. For all Vessels other than tankers, laytime shall cease when the Vessel is released by the terminal or the Cargo inspector, as the case may be, or, absent such release, upon disconnection of hoses after all Cargo has been loaded.

## 5.10 <u>Demurrage</u>.

(a) <u>Rate</u>. Demurrage shall be payable by Seller for all time that used laytime exceeds the allowed laytime set forth in a Confirmation at the following demurrage rates:

(i) For voyage chartered equipment, the rate shall be based on the rate specified in Buyer's transportation contract. For demurrage purposes, all barges or tows operating as a unit shall be considered collectively as one barge or tow. Under no circumstances shall Seller be required to pay demurrage unless such demurrage was paid by Buyer.

(ii) For owned, time chartered, and bareboat chartered equipment, the rate shall be at the charter party rate unless otherwise agreed.

(b) <u>Documentation and Filing of Demurrage Claims</u>. Prior to the sailing of the Vessel, Seller shall be provided with a copy of the Vessel's time log. Demurrage claims shall be accompanied by a copy of the Vessel's pumping logs signed by the Vessel's master, a copy of the charter party if applicable, agent's port log, NOR document(s), laytime statement, the Vessel owner's demurrage invoice and calculations, the Vessel's Statement of Facts, as well as such other supporting data as may be reasonably requested by Seller. Any demurrage claim by Buyer must be

submitted in writing and actually received by Seller with all supporting documentation within 60 days from the date of completion of loading. **IF THE APPROPRIATE DOCUMENTATION IS NOT ACTUALLY RECEIVED WITHIN THE SPECIFIED TIME, THE CLAIM SHALL BE DEEMED TO BE WAIVED.**

### 5.11 Other Marine Terms Applying to FOB Sales.

(a) Non-Compliance with Terminal Regulations. The Terminal Operator may order the Vessel to vacate its berth if the Vessel fails to comply with the terminal's regulations. All expenses and time until the Vessel has re-berthed shall be for Buyer's account.

(b) Breakdown of Vessel Safety or Environmental Systems. The Terminal Operator may order the Vessel to vacate its berth if there is a deficiency or failure in the Vessel's safety or environmental systems. All expenses and time until the Vessel has re-berthed shall be for Buyer's account.

(c) Regulatory Compliance. Buyer warrants that, throughout the Cargo transfer operation, the Vessel shall fully comply, or hold authorized waivers for non-compliance, with all applicable flag state regulations, including U.S. Coast Guard regulations, in effect as of the date that the Vessel berths. All expenses and time lost as result of a breach of this warranty shall be for Buyer's account.

(d) Environmental Compliance.

   (i) Buyer warrants that each Vessel shall comply with all Applicable Law, including all environmental laws, while at each Cargo Transfer Point or while in the vicinity of each Cargo Transfer Point. If any Vessel fails to comply with Applicable Law, the Vessel may be prohibited from berthing or may be required to vacate its berth and proceed from port. All expenses and time lost until such Vessel re-berths shall be for Buyer's account.

   (ii) Buyer is responsible for providing safety equipment to the crew of the Vessel when the Cargo is high in sulfur content (ten parts per million or more) or is otherwise dangerous to health.

   (iii) Buyer warrants that in the event that the Vessel is equipped with a vapor recovery system, the entire vapor system including piping and Cargo compartments shall be free of rust scale and particulate matter. Any delays and costs associated with collection of particulate matter in the terminal's vapor control system shall be for Buyer's account. Seller may reject any Vessel that is not free of particulate matter in the vapor system.

(e) Oil Pollution Responsibility Certificate. Buyer warrants that the Vessel shall comply with the U.S. Water Pollution Control Act and the U.S. Oil Pollution Act of 1990 (OPA 1990), and regulations issued pursuant thereto, and shall have secured and carry onboard a current U.S. Coast Guard Certificate of Financial Responsibility (Water Pollution). Vessels shall also have onboard any other federal or state Proof of Financial Responsibility Certificate that may be required at the Cargo Transfer Point. All expenses and time lost as a result of a breach of this warranty shall be for Buyer's account.

(f) Pollution Prevention and Responsibility. In the event any spill, escape or discharge of Cargo or bunkers occurs or is threatened from the Vessel and causes or threatens to cause pollution damage, the Vessel shall promptly notify Seller and all appropriate Governmental Authorities and shall take all necessary measures to

prevent or mitigate such damage, keeping Seller and all appropriate Governmental Authorities apprised of all such measures, whether already taken or contemplated, as promptly as possible. Buyer hereby authorizes Seller, upon notice to Buyer, to undertake such measures as Seller deems reasonably necessary to prevent or mitigate the pollution damage. Seller shall keep Buyer advised of the nature and results of any such measures taken, and if time permits, the nature of the measures intended to be taken. Any of the aforementioned measures shall be at Buyer's time and expense, provided, however, that if Seller caused or contributed to such spill, escape or discharge, the expense of the aforementioned measures shall be borne by Seller in proportion to its negligence in causing or contributing to the spill, escape or discharge. In the event that Buyer wants such measures discontinued, Buyer shall so notify Seller and thereafter Seller shall have no right to continue said measures at Buyer's expense. **THIS "POLLUTION PREVENTION AND RESPONSIBILITY" PROVISION IS NOT INTENDED TO, AND DOES NOT, EXPAND THE RIGHTS AND OBLIGATIONS OF EITHER PARTY UNDER APPLICABLE LAW AGAINST OR TO THE OTHER PARTY IN CONNECTION WITH LIABILITY FOR COSTS, DAMAGES, FINES, AND PENALTIES ARISING FROM OR IN CONNECTION WITH ENVIRONMENTAL POLLUTION.**

(g) P&I Insurance.

(i) ITOPF. Buyer warrants that each Vessel nominated to carry Cargo is owned or demise chartered by a member of the International Tanker Owners Pollution Federation Limited (ITOPF).

(ii) Tankers. Buyer warrants that throughout the term of each tanker's service under a Transaction, such tanker shall have full and valid Protection and Indemnity Insurance ("P&I Insurance"), including valid pollution liability insurance ("Pollution Cover"), from a P&I Club that is a member of the International Group of P&I Clubs and is approved by Seller (such approval not to be unreasonably withheld). The cost of P&I Insurance and Pollution Cover shall be for Buyer's account. The P&I Insurance must include the maximum cover available from the International Group of P&I Clubs against liability for pollution (presently one billion U.S. dollars), unless some other amount is specifically agreed to in a Confirmation.

(iii) Other Vessels. Buyer warrants that throughout the term of service of any Vessel (other than a tanker) under a Transaction, such Vessel shall maintain full and valid P&I Insurance, including valid Pollution Cover, from a P&I Club that is a member of the International Group of P&I Clubs, or, if such Vessel is not entered with a P&I Club, full and valid commercial insurance covering the same classes of risks as would be covered by customary P&I Insurance and Pollution Cover ("Commercial Insurance") on such Vessel. Such P&I Insurance, Pollution Cover or Commercial Insurance shall be for Buyer's account, free of cost and expense to Seller.

If requested to do so at any time during the term of a Transaction, Buyer shall promptly furnish to Seller reasonable evidence of the foregoing required P&I Insurance, Pollution Cover or Commercial Insurance. Buyer shall notify Seller immediately of any change or threatened change in the aforesaid P&I Insurance, Pollution Cover or Commercial Insurance. The foregoing obligations of Buyer are an essential part of a Transaction. The obligations of Seller under a Transaction are conditioned on such insurance obligations. Any

breach of such insurance obligations shall entitle Seller to terminate the relevant Transaction without limiting its right to recover damages.

(h) <u>Drug and Alcohol Policy</u>. Buyer warrants that any Vessel (not otherwise subject to U.S. Department of Transportation drug and alcohol regulations) that is nominated to Seller shall be operating under a drug and alcohol policy that meets or exceeds the standards in the Oil Companies International Marine Forum (OCIMF) guidelines in effect as of the date of such nomination.

(i) <u>Inert Gas System</u>. All Vessels fitted with an Inert Gas System ("IGS") shall not be permitted to berth for loading or discharge of any Cargo unless the IGS is fully operational and all cargo tanks are inerted with an oxygen level at or below eight percent (8%). For Vessels intending to handle Cargo that could be adversely affected by inert gas, and for Cargo that does not require inert gas blanketing, Buyer may request from Seller an exemption from this paragraph at least three Business Days prior to the Vessel's arrival at the Cargo Transfer Point. For Vessels engaged in crude oil trade operations, positive inert gas pressure at or below eight percent (8%) oxygen content shall be maintained on all cargo tanks and slop tanks throughout the transfer and any COW operation. If Seller consents, manual gauging/sampling of OBQ or ROB may be accomplished per API MPMS Chapter 17.2 or any similar provision. Should the IGS fail after the Vessel has berthed, the Cargo transfer operation shall be terminated immediately and the Vessel may be ordered to vacate the berth until the IGS is fully operational and tanks are inerted to the requisite pre-arrival condition. Temporary or substitute equipment or procedures to correct IGS malfunctions may not be used without Seller's approval. All expenses and time lost in connection with IGS failure and between berthings are for Buyer's account.

(j) <u>Vessel Connection Construction</u>. Buyer warrants that all piping, valves, spools, reducers and other fittings comprising that portion of the Vessel's manifold system outboard of the last fixed rigid support to the Vessel's deck and used in the transfer of Cargo, bunkers or ballast, will be made of steel or nodular iron. The fixed rigid support for the manifold system must be designed to prevent both lateral and vertical movement of the manifold. Buyer further warrants that no more than one reducer or spool piece (each ANSI standard) will be used between the Vessel's manifold valve and the terminal hose or loading arm connection.

(k) <u>Carrier Alpha Code</u>. Buyer warrants that the bill of lading issuer shall have and use a standard carrier alpha code required by U.S. Customs and Border Protection regulations.

(l) <u>U.S. Customs Compliance</u>. Buyer warrants that the Vessel shall fully comply, or hold waivers for noncompliance, with all applicable U.S. Customs and Border Protection regulations in effect as of the date Vessel berths. Buyer shall provide all required customs information to Seller at least three Business Days prior to Vessel arrival.

(m) <u>Terminal-Related Conditions</u>.

    (i)   <u>Safe Berth Availability and Charges</u>.

        (A) The Terminal Operator shall exercise due diligence to provide a safe berth to which the Vessel may proceed to or depart from, and where the Vessel can always lie safely afloat. However, if the Vessel cannot, in the Terminal Operator's sole opinion, maintain its mooring safely at the

dock, then the Terminal Operator may, in its sole discretion, order hold-in tugs, and the cost of such tugs shall be for Buyer's account. The Terminal Operator shall provide a safe berth for the Vessel free of wharfage fees for normal Cargo transfer. The Vessel shall vacate the berth promptly after hoses are disconnected. A wharfage fee may be charged to Buyer for discharge extended beyond 36 hours or if the Vessel remains at the berth after hoses are disconnected. Dockage and service fees, including mooring, booming, fresh water, steam and oily slops receipts will be charged to Buyer. In addition, all duties and other charges on the Vessel, including those incurred for tugs, pilots, and other port costs shall be for Buyer's account.

(B) Notwithstanding anything contained in this "Safe Berth Availability and Charges" provision, Seller shall not warrant the safety nor draft of public channels, fairways, approaches thereto, anchorages or other publicly-maintained areas either inside or outside the port area where the Vessel may be directed.

(ii)   <u>Vacating of Berth</u>.   Seller may order the Vessel to vacate its berth if it appears that the Vessel will not, because of the Vessel's disability, be able to complete loading of Cargo within 36 hours (or such shorter period as may be provided in a Confirmation) of Vessel's arrival in berth.   Seller retains the right to order the Vessel to vacate its berth in order to prevent damage to the Vessel or Seller's berth due to weather related events, or any event or circumstance that Seller, in its sole opinion, determines to be a safety or environmental hazard. All expenses and time between disconnection of the hoses until reconnection of hoses shall be for Buyer's account.

(iii)  <u>Shifting of Vessels</u>.  All expenses and time lost during any shifting of the Vessel within a port shall be for Buyer's account, unless such shifting is done at Seller's option. In addition to Seller's remedies elsewhere in these GTCs, Seller may, at its option, shift the Vessel within a berth or between berths, as well as to and from the anchorage. Expenses and time during such optional shifting or anchoring of the Vessel shall be for Seller's account, unless such shifting is performed due to Buyer's negligence or unless otherwise set forth in a Confirmation or these GTCs.

(iv)   <u>Ballasting and Cargo Slops</u>.  If the Cargo Transfer Point has ballast water and/or slops facilities, the Vessel may discharge ballast water and/or Cargo slops up to the maximum capacity available. All time used during ballasting, deballasting or offloading slop, and any charges for such services, shall be for Buyer's account. Any time lost by delay in furnishing such facilities shall be for Buyer's account. All time consumed by the Vessel in shifting to and/or from such facilities, as well as the shifting expenses such as costs for tugs, mooring and pilots, shall be for Buyer's account.

(v)    <u>Special Provisions for Foreign Cargo Slops</u>.  Seller shall be notified at least three Business Days in advance of discharge when a Vessel desires to discharge foreign Cargo slops. Such notification shall include the following information regarding the foreign Cargo slops: identity, description or chemical properties of components, country of origin, estimated value and estimated quantity.   All expenses, including customs fees, expenses associated with the clearing of foreign Cargo slops through U.S. Customs

and Border Protection, the testing of the Cargo slops, and the removal and proper disposal of the Cargo slops shall be for Buyer's account.

(vi) <u>Vessel-Generated Waste</u>. In the event there is Vessel-generated waste, fees associated with the testing, removal or reception of Vessel-generated waste, including fuel and lube oil sludge and oil bilge water, shall be for Buyer's account. Any delay in furnishing reception facilities at a terminal for Vessel-generated waste shall be for Buyer's account. If the Vessel must shift to and/or from such facilities, all time consumed by the Vessel shifting, as well as shifting expenses such as for tugs, mooring and pilots, shall be for Buyer's account. Buyer shall retain title to the waste material until it is tested and commingled with terminal waste or, alternatively, delivered to a waste disposal company possessing a valid permit.

(vii) <u>Pollution Control Representative</u>. Seller may, at its option, place Pollution Control Representatives ("<u>PCRs</u>") on board the Vessel to observe loading of Cargo and related operations during the period that the Vessel is at a Cargo Transfer Point. In addition, either Party may, at its option, place a PCR on any Vessel involved in a lightering, topping-off, or other ship-to-ship loading operations. PCRs will advise each Vessel master or mooring master about avoidance of pollution, unsafe acts or violations of terminal regulations. However, the PCRs are not authorized to and shall not, under any circumstances, order or direct the undertaking of any particular action or interfere in any way with the master's exercise of authority. The responsibility and liability for any pollution, unsafe act or violation of terminal regulations remains solely with Buyer, the Vessel, and its master.

(viii) <u>Hoses, Simultaneous Discharge, and Discharge Rate</u>.

(A) Hoses between the tanker and the shore flanges shall be furnished by the Terminal Operator. Flanges for hose connections should be at or near the Vessel's dockside rail. Crossover hoses between barges, or hoses at crossover offshore manifolds of Vessels (*i.e.*, "jumpers"), shall be furnished and connected by the Vessel at the sole risk and expense of Buyer.

(B) The Vessel's Cargo hoses, including marine vapor recovery and offshore manifold crossover hoses (or jumpers), must be tested annually and shall have been in service for less than five years. Documentation of annual testing and service age must be on board the Vessel and must be made available to Seller on request. Any time lost due to verification of compliance shall be for Buyer's account.

(C) If requested by Seller, the Vessel shall simultaneously load more than one grade of Product if Vessel is technically capable of doing so.

(ix) <u>Damage to Seller or Terminal Property or Personal Injury or Death</u>. Buyer assumes full responsibility and liability for any damage sustained by wharves, berths, docks, tugs, or vessels owned or maintained by Seller, or for which Seller is responsible, and for personal injury or death, arising out of the negligent or improper operation of the Vessel or any other waterborne craft ordered by, or being operated for Buyer's account. Buyer shall fully and completely defend and indemnify Seller in respect of any and all such property damages or personal injury or wrongful death claims.

(x) <u>Crude Oil Washing</u>. If Vessel is equipped to crude oil wash, Buyer warrants that the Vessel complies with all international, national and local requirements applicable to COW. The Vessel must inform Seller of its intention to COW at least 48 hours prior to berthing. The number of tanks to be crude oil washed shall be limited to the minimum required by Applicable Law, unless Seller agrees or orders otherwise. In the event COW operations occur at Seller's request, the maximum warranted pumping time shall be increased by six hours if all cargo tanks are crude oil washed, or by the prorated portion thereof if fewer than all cargo tanks are crude oil washed.

(xi) <u>Shore Lines</u>. If requested by Buyer at least three Business Days prior to the Vessel's arrival, Seller shall exercise reasonable efforts to perform a line press or line displacement prior to loading to determine the status of shorelines and ensure full accuracy of Cargo measurement.

(xii) <u>Stowaways</u>. Buyer assumes full responsibility and liability for any and all costs or damages incurred due to a stowaway entering the United States aboard its Vessel. Buyer shall be responsible for all costs associated with security of the terminal due to a stowaway, as well as the costs to apprehend, detain, and deport any stowaway.

## PART III - TERMS IN RESPECT OF CIF, CFR, DES, DDU, DDP DELIVERIES

## 6. TITLE AND RISK OF LOSS

### 6.1 CIF/CFR.

(a) For CIF/CFR Vessel Transactions, title to and risk of loss of the Product shall pass from Seller to Buyer as the Product passes the last permanent flange connection between the cargo intake manifold of the Vessel and the delivering hose at the loading terminal.

(b) **In respect of any CIF Vessel Transaction, Seller shall procure marine cargo insurance on the minimum coverage, but no less than 110% of the CIF value of the Cargo for the benefit of Seller and Buyer, as their respective interests may appear, which shall cover the period of time when risk of loss passes to Buyer until delivery of the Product at the discharge port when the Product passes the flange connection between the Vessel's discharge manifold and the receiving hose.**

### 6.2 DES/DDU/DDP/Delivered.

(a) For DES/DDU/DDP Vessel Transactions, title to and risk of loss of the Product shall pass from Seller to Buyer as the Product passes the last permanent flange connection between the cargo discharge manifold of the Vessel and the receiving hose at the discharge terminal.

(b) For delivered pipeline Transactions, title and risk of loss shall pass from Seller to Buyer as the Product passes the flange of the meter measuring discharge of Product from the pipeline.

(c) For delivered rail Transactions, title and risk of loss shall pass from Seller to Buyer as the Product passes the receiving flange of the terminal.

(d) For delivered truck Transactions, title and risk of loss shall pass from Seller to Buyer as the Product passes the tank truck's delivery equipment.