(e) For delivered tank-to-tank transfers or pumpovers, title and risk of loss shall pass from Seller to Buyer as the Product passes the inlet flange of Buyer's storage tank.

**6.3**  **Stock (In-Tank) Transfers.**  When delivery of Product is by stock transfer (where physical inventory is transferred on the books and records of a terminal or pipeline operator from Seller to Buyer), title to and risk of loss of the Product shall pass from Seller to Buyer, unless otherwise agreed or indicated on the documentation issued by the Terminal Operator, at 00:01 on the effective date of transfer as mutually agreed between the Parties.

**6.4**  **Pipeline Tariff Recovery.**  With respect to pipeline deliveries of Product, in the event that Buyer and Seller agree that Seller shall deliver Product from the relevant pipeline at a location other than the Delivery Location, then (i) in the event such delivery results in increased transportation costs for Seller, Buyer agrees to pay Seller, for the volume delivered, the pipeline tariff differential between the Delivery Location and the actual delivery point, based on the applicable pipeline tariff tables in effect for such pipeline on the date of delivery, or (ii) in the event such delivery results in reduced transportation costs for Seller, Seller shall, for the volume delivered, reduce the amount due under the applicable invoice for such delivery by an amount equal to the pipeline tariff differential between the Delivery Location and the actual delivery point, based on the applicable pipeline tariff tables in effect for such pipeline on the date of delivery.

# 7.  QUANTITY, QUALITY AND INSPECTION

**7.1**  **Inspection.**  The quantity and quality of the Product sold under a Transaction shall be determined by an Independent Inspector, whose determinations shall be conclusive and binding upon both Parties, absent fraud or manifest error.  The cost of the Independent Inspector's services shall be shared equally between the Parties.  Seller may have a representative present at the time of title transfer and Buyer shall always provide Seller with free access to ship and shore facilities.  The Parties shall instruct the Independent Inspector to obtain and retain appropriate samples of the Product for a period of 90 days from the date of measurement.

(a)  CIF, CFR Vessel Deliveries.  The quantity of Product supplied shall be based on static shore tank measurements taken prior to and after loading of Seller's Vessel according to latest API standards.  The quality of Product shall be based on analysis performed using shore tank composite samples taken prior to loading.  If shore tanks are active at loading, quantity shall be determined by Vessel figures (i.e., closing ullages less OBQ adjusted by VEF).  Such VEF shall be determined in accordance with the latest standards of API.  Any circumstance relating to quantity shall be governed by current API standards.  Any circumstance relating to quality shall be governed by current API/ASTM standards.

(b)  DES Deliveries.  The quantity of Product sold shall be based on static shore tank measurements taken prior to and after discharge of Seller's Vessel according to latest API specifications.  The quality of Product shall be based on Vessel composite samples taken prior to discharge.  Temperature corrections shall be made in accordance with the latest ASTM/API tables and samples shall be tested using methods listed in ASTM/API standards.  If automatic sampling is used, such samples must be taken by equipment meeting the requirements of the latest API standards.  The quantity of Product shall be adjusted for any voids in the delivery system between the Vessel and shore tanks.  The quantity of Product shall not be determined by shore tank measurements when: tanks are active, the Product in the

tank is non-liquid, or other factors as stated in the API standards impact the accuracy of tank measurements. In such cases, the quantity of Product shall be determined by Vessel figures (*i.e.*, arrival quantity less remaining OBQ adjusted by VEF), which shall be determined in accordance with the latest API standards. Lighterage, if required, shall be for Buyer's account. In the event that a part Cargo is lightered from Seller's Vessel, that quantity of Product shall be determined from the Independent Inspector's gauging of the lightering (receiving) Vessel's tanks adjusted by its VEF. Any circumstance relating to quantity shall be governed by the latest API standards. Any circumstance relating to quality shall be governed by the latest API/ASTM standards.

(c) <u>CFR/CIF Outturn Quantity and Quality</u>.  In the event of a CFR/CIF outturn delivery, the quantity shall be measured based on the procedures set forth in the preceding "DES Deliveries" provision.

(d) <u>Pipeline Transactions</u>.  The quality of Product shall be in accordance with the specifications set forth by the relevant pipeline. Quantities shall be determined by pipeline meter tickets based on calibrated pipeline meters or if such meters are unavailable, by calibration tables, or based on book, stock or inventory transfer.

(e) <u>Truck and Rail Transactions</u>.  The quality of Product shall be based on shore tank composite samples taken prior to loading as evidenced by the Independent Inspector's report according to ASTM/API industry standards. The quantity of Product shall be determined using terminal tank gauges or weigh scales and evidenced by bill of lading(s) or based on book, stock or inventory transfer.

## 7.2  *Railcar Demurrage and Detention*.

(a) *If delivery of any Product is made by rail, Buyer may use the railcars only for the transfer and discharge of the Product at the Delivery Location. For the purpose of detention, time shall start at the first 00:01 after the railcars are constructively placed at the disposal of Buyer. For the purpose of detention, time shall end when all empty railcars are made available at the receiving terminal for collection by, or on behalf of, Seller. Buyer shall be responsible for demurrage and detention charges (as applicable) to the extent it delays discharge of the railcars. Buyer also shall pay Seller, upon receipt of Seller's invoice, for any demurrage or storage charges levied by any third-party transportation company as a result of Buyer not returning railcars to the railroad within the allowed freetime. Buyer will not divert Seller's railcars or consign them to any other routing or to any other destination than that set out in the bill of lading instructions without obtaining prior written consent of Seller. All diversion charges, additional freight charges and any other costs or expenses incurred, sustained or paid by Seller resulting from such diversion shall be for Buyer's account.*

(b) *The demurrage charges shall be as per the applicable railroad tariff and the detention charges shall be as per the railcar lease rate. Detention charges shall not apply to the first five days of delay.*

## 7.3  <u>Odorant</u>.  NGLs sold under any Transaction are intended for further processing and no further odorization is required unless Buyer notifies Seller otherwise. Buyer shall indemnify Seller for any liabilities that result from the NGLs not being odorized when Buyer has failed to notify Seller that odorants should be added. Seller shall indemnify

Buyer for any liabilities that result from the NGLs not being odorized when Buyer has notified Seller that odorants should be added and Seller fails to do so.

7.4 **Claims.** Any claim regarding the quality or quantity of Product delivered shall be deemed waived unless submitted to Seller in writing, together with supporting documentation and reasonable details of the facts on which the claim is based, within 30 days from the title transfer date of such Product.

## 8. NOMINATIONS, LAYDAYS, LAYTIME AND DEMURRAGE

8.1 **Vessel Nomination.** Not less than seven days before a tanker's arrival or four days before a barge's arrival at the Cargo Transfer Point, Seller shall nominate for Buyer's acceptance the Vessel that will discharge the Cargo. Seller shall at the same time provide all Vessel data necessary to evaluate acceptability of the Vessel, including Vessel particulars, construction, dimensions, equipment, licenses, classification and all other information as may be required by Buyer.

8.2 **Vessel Acceptance.** Notice of acceptance or rejection of the nominated Vessel shall be communicated to Seller as soon as possible but always within 48 hours, excluding Saturdays, Sundays and holidays, after Buyer's receipt of nomination and all required data.

8.3 **Vessel Substitution.** If a Vessel nomination is rejected by Buyer, Seller shall nominate another, suitable Vessel for Buyer's acceptance as provided in these GTCs. If a Vessel nomination is accepted by Buyer, Seller may substitute another Vessel by nominating it for Buyer's acceptance. Nomination of a substitute Vessel shall be made no later than four days before the Vessel's arrival at the Cargo Transfer Point.

8.4 **ETAs.** Seller shall notify Buyer in writing by facsimile, letter or other writing of the Vessel's ETA at the Cargo Transfer Point. Such notice must be received by Buyer at least seven days in advance of such arrival by a tanker or four days in advance of such arrival by barge, or within 24 hours after the Vessel has sailed from the last port before arriving at the Cargo Transfer Point, whichever date is earlier. Seller also shall provide Vessel ETA in writing 72, 48, 24 and six hours before the Vessel's expected arrival at the Cargo Transfer Point. Seller promptly shall notify Buyer in writing if the ETA changes by more than two hours following the 24-hour notice.

8.5 **Laydays.** The Laydays in the relevant Confirmation constitute a window for arrival of the Vessel at the Cargo Transfer Point.

8.6 **Laytime.** Laytime shall be per the terms of the Vessel charter party.

8.7 **Demurrage.** Demurrage shall be per the rate, terms and conditions of the Vessel charter party.

8.8 **In-Harbor Lightering.** In-harbor lightering shall not be permitted without Seller's prior approval. In-harbor lightering shall be performed at Buyer's sole expense, time and risk. Buyer shall indemnify and hold Seller harmless for any loss or liability resulting from in-harbor lightering.

## PART IV – TERMS IN RESPECT OF ALL DELIVERIES

## 9. PAYMENT

9.1 **Payment Due Date.** The payment due date and required documentation for payment shall be as established in the relevant Confirmation. Notwithstanding the foregoing, if

transfer of Product is made by book, stock or inventory transfer, payment shall be due on the effective date of such transfer.  All payments shall be made in U.S. dollars without offset, deduction or counterclaim by wire transfer of immediately available funds to Seller at such account as Seller may designate in writing.  Invoices and supporting documents received after 12:00 p.m. Buyer's local time shall be considered to be received on the next Business Day.

9.2    **Required Documentation**.  Supporting documentation shall be as follows:

(a) FOB – Foreign Vessels

    (i)    Invoice (facsimile acceptable).

    (ii)    Copy(ies) of Independent Inspector's report of loaded quantity and quality (may be presented as two separate documents) (facsimile acceptable).

    (iii)    Full set of original bills of lading properly issued or endorsed to Buyer without restriction or qualification of any kind or 2/3 original bills of lading and master's or owner's or agent's receipt for 1/3 bill of lading and other usual shipping documents.

    (iv)    In the event that the original bills of lading or other usual shipping documents as described above are not available by the payment due date, Buyer shall pay Seller against presentation of documents (i) and (ii) and Seller's letter of indemnity in the format stipulated in Exhibit A.

(b) FOB – U.S. Vessels and All Barges

    (i)    Invoice (facsimile acceptable).

    (ii)    Copy(ies) of Independent Inspector's report of loaded quantity and quality (may be presented as two separate documents) (facsimile acceptable).

(c) FOB & Delivered Pipeline

    (i)    Invoice.

    (ii)    Pipeline meter ticket.

(d) FOB & Delivered Truck

    (i)    Invoice (facsimile acceptable).

    (ii)    Truck bill of lading.

(e) FOB & Delivered Rail

    (i)    Invoice (facsimile acceptable).

    (ii)    Tank car bill of lading.

(f) CIF & CFR – Foreign Vessels

    (i)    Invoice (facsimile acceptable).

    (ii)    Copy(ies) of Independent Inspector's report of loaded quantity and quality (may be presented as two separate documents) (facsimile acceptable).

    (iii)    Full set of original bills of lading properly issued or endorsed to Buyer without restriction or qualification of any kind or 2/3 original bills of lading and master's or owner's or agent's receipt for 1/3 bill of lading and other usual shipping documents.

    (iv)    In the event that the original bills of lading or other usual shipping documents as described above are not available by the payment due date,

Buyer shall pay Seller against presentation of documents (i) and (ii) and Seller's letter of indemnity in the format stipulated in <u>Exhibit A</u>.

(g) <u>CIF & CFR – U.S. Vessels and All Barges</u>

   (i)   Invoice (facsimile acceptable).

   (ii)  Copy(ies) of Independent Inspector's report of loaded quantity and quality (may be presented as two separate documents) (facsimile acceptable).

(h) <u>DES Vessel</u>

   (i)   Invoice (facsimile acceptable).

   (ii)  Certificate of quality and/or Independent Inspector's quality report at discharge port (facsimile acceptable).

   (iii) Certificate of quantity and/or Independent Inspector's quantity report at discharge port (facsimile acceptable).

(i) <u>Tank-to-Tank Transfer</u>

   (i)   Invoice (facsimile acceptable).

   (ii)  Transfer documentation from Independent Inspector or in the absence of an Independent Inspector, from the terminal.

(j) <u>Stock (In-Tank) Transfer</u>

   (i)   Invoice (facsimile acceptable).

   (ii)  Transfer documentation from Seller or the terminal.

**9.3**   **Split Weekend Clause.** If the payment due date falls on a Sunday, or on a Monday that is not a Business Day in the place where payment is to be made, payment shall be made in immediately available funds to Seller on the next Business Day after such payment due date. If the payment due date falls on a Saturday, or on a non-Business Day other than a Monday in the place where payment is to be made, payment shall be made in immediately available funds to Seller on the last Business Day prior to such payment due date.

**9.4**   **Interest.** Any amount payable by a Party to another Party pursuant to a Transaction shall, if not paid when due, bear interest from the payment due date until, but excluding, the date payment is received by the owed Party, at the Interest Rate.

**9.5**   **Rounding.** Rounding conventions shall be as follows: Product pricing in Gallons shall be rounded to the nearest fourth decimal place and Product pricing in Barrels shall be rounded to the nearest third decimal place. All dollar amounts shall be rounded to the nearest cent.

**9.6**   **Disputed Invoices.** If an invoiced Party, in good faith, disputes the accuracy of the amount invoiced for Product delivered by the other Party, the invoiced Party shall pay such amount as it in good faith believes to be correct and provide written notice stating the reasons why the remaining disputed amount is incorrect, along with supporting *documentation acceptable in industry practice*. In the event the Parties are unable to resolve such dispute, either Party may pursue any remedy available at law or in equity to enforce its rights under any Transaction. In the event that it is determined or agreed that the Party that is disputing an invoice must or will pay the disputed amount, then such Party shall pay interest from and including the original payment due date until, but excluding, the date the disputed amount is received by the owed Party, at the Interest Rate.

**9.7    Netting of Invoices.**  In the event the Parties agree to net invoices for Product amounts that are due each other on the same payment due date, the Parties shall confirm at least two Business Days prior to the payment due date, orally or in writing, the invoice amounts and any amounts remaining, if any, after net-out. Any remaining balance after net-out shall be paid by the Party owing such amount to the other Party on the applicable payment due date. The owing Party's payment of a net amount shall satisfy each Party's payment obligations under the relevant Transactions in respect of the invoices included in the settlement on a payment due date. The Parties understand and agree that such netting of invoices is expressly limited to amounts owed from purchases and sales of Product between the Parties and that netting out any other amounts due in respect of any Transaction, for any reason whatsoever, including quality claims and demurrage, is strictly prohibited unless otherwise agreed in writing.

**9.8    Transaction Netting; Bookouts.**

(a)  _Transaction Netting._  If the Parties enter into one or more Transactions that, in conjunction with one or more other outstanding Transactions, constitute Offsetting Transactions, then all such Offsetting Transactions may, by mutual agreement of the Parties, be netted into a single Transaction so that: (i) the Party obligated to deliver the greater amount of the Product will deliver the difference between the total amount it is obligated to deliver and the total amount to be delivered to it by the other Party under the Offsetting Transactions, and (ii) the Party owing the greater aggregate payment will pay the net difference owed between the Parties. Each single Transaction resulting under this "Transaction Netting" provision shall be deemed part of the single agreement between the Parties referenced in the "Single Agreement" provision, and once the Parties' obligations under such resulting single Transaction are satisfied, outstanding obligations under the Offsetting Transactions that are satisfied by such offset shall terminate.

(b)  _Bookouts._  If, for scheduling convenience purposes, the Parties agree verbally or in writing, either bilaterally or as part of a multiparty arrangement, to a cancellation or modification of future physical delivery obligations in respect of a Transaction (in each case, a "Bookout"), then effective upon the relevant future delivery date (the "Bookout Date"): (i) the delivery obligations under the relevant Transaction will be extinguished or modified (whether in whole or in part) as agreed, and (ii) any agreed payment will be due as follows, unless otherwise agreed: (A) with respect to Product that is a refined petroleum product, on the Bookout Date, (B) with respect to Product delivered that is crude oil, on the 20th day of the month following the month of the Bookout Date, or (C) with respect to Product that are LPGs or NGLs, within five Business Days following the Bookout Date. At any time prior to the relevant Bookout Date, either Party may elect, at its option and upon notice to the other Party, to cancel the Bookout and thereby restore all original contract terms, including delivery and payment, all without liability to the other Party. This "Bookouts" provision shall apply notwithstanding that either Party may fail to (i) send out a writing confirming the Bookout Transaction or (ii) make changes on its books as a result of any such Bookout Transaction.

## 10.  CREDIT

**10.1    Security.**  If Seller has provided trade credit to Buyer, Seller, in its sole discretion, may increase or decrease the amount of such trade credit from time to time under any Transaction.  If Buyer exceeds its credit limit with Seller, Seller may, in its sole discretion, require Buyer to provide it with credit support with respect to Buyer's

ability to perform all of its obligations hereunder.  Upon Seller's request, Buyer shall provide to Seller, in each case in Seller's sole discretion, one or more of the following forms of credit support: (i) an irrevocable standby letter of credit that meets the requirements of the "Letter of Credit" provision, (ii) Buyer's remittance of payment to Seller at least 48 hours prior to delivery, (iii) Buyer's provision of a guaranty acceptable to Seller from an affiliate of Buyer and (iv) any other form of credit support acceptable to Seller.

10.2 **Performance Assurance.**  Seller may, in its sole discretion and upon notice to Buyer or its Credit Support Provider, if any, require that Buyer or its Credit Support Provider provide it with Performance Assurance of Buyer's or its Credit Support Provider's ability to perform any of its obligations under a Transaction, under any guaranty or any credit support agreement, respectively, in an amount determined by Seller in a commercially reasonable manner.  Unless Seller specifies a different time period, Buyer or its Creditor Support Provider shall furnish Performance Assurance within two Business Days following receipt of Seller's written demand.  If the security is cash, then Buyer shall deliver the cash to Seller as a deposit, which shall become the property of Seller once delivered.

10.3 **Letter of Credit.**  In the event that Seller requires a letter of credit as to any Transaction or Transactions, payment shall be covered by an irrevocable standby letter of credit to be issued and the original received by Seller not later than three Business Days prior to the first day of the contractual delivery window, in Seller's format attached as <u>Exhibit B</u> (or, in the case where a single letter of credit will cover multiple Transactions, in a form acceptable to Seller) and issued by an Acceptable Letter of Credit Issuer.  Such letter of credit shall be opened with sufficient value to cover the aggregate contractual volume plus ten percent (10%) times the aggregate price specified in the Confirmation.  If at the time of executing the letter of credit the price is not fixed, the pricing clause of the Confirmation shall be quoted in the letter of credit and the letter of credit shall be opened with sufficient value to cover the aggregate contractual volume plus ten percent (10%) times a mutually agreed estimated price. If, after the price of a Transaction is fixed, the value of the letter of credit is not sufficient to cover the aggregate contractual volume plus ten percent (10%) times the aggregate price, then Seller may request that Buyer provide it with an amended letter of credit with sufficient value not later than the next Business Day following the date on which Seller requests the amended letter of credit.  The letter of credit shall include an expanded validity for shipment period starting five days prior and ending five days after the contractual delivery window.  All bank charges related to the letter of credit are for Buyer's account.  The letter of credit shall not expire until 30 days after the final invoice due date.

10.4 **Letter of Credit Default.**  Upon the occurrence of a Letter of Credit Default, Buyer agrees to deliver a substitute letter of credit or other collateral acceptable to Seller, in its sole discretion, not later than the next Business Day following the date on which the Letter of Credit Default occurred.  The failure to deliver timely a substitute letter of credit or other collateral acceptable as required by Seller shall be an Event of Default as to the relevant Transaction or Transactions.

## 11. DISCLAIMER OF WARRANTIES

OTHER THAN SELLER'S WARRANTIES OF TITLE SET FORTH IN THESE GTCS, OR UNLESS OTHERWISE STATED IN A CONFIRMATION, SELLER MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING ANY

REPRESENTATION OR WARRANTY REGARDING MERCHANTABILITY, FITNESS OR SUITABILITY OF THE PRODUCT FOR ANY PARTICULAR PURPOSE, EVEN IF SUCH PURPOSE IS KNOWN TO SELLER UNLESS OTHERWISE STATED IN THE CONFIRMATION FOR A PARTICULAR TRANSACTION. SELLER EXPRESSLY DISCLAIMS ANY WARRANTY AGAINST INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT.

## 12. IMPORTER DUTIES, DRAWBACK AND TAXES

12.1 With respect to Cargoes imported into the United States or a foreign jurisdiction, the importer of record set forth in the Confirmation shall be responsible for all import arrangements and customs requirements, including all duties, fees and related costs in respect of importing and unloading the Cargo at the discharge port. The importer of record indicated in the Confirmation shall be responsible for all Taxes arising from or imposed upon importation of the Cargo. Unless otherwise agreed, the importer of record shall be entitled to any duty drawback rights.

12.2 Buyer represents that it is registered with the Internal Revenue Service ("IRS") and the state of importation to engage in tax-free Transactions with respect to taxable fuels. Prior to the scheduled delivery date or book, stock or inventory transfer date, Buyer shall provide Seller with proper notification, exemption or resale certificates or direct pay permits as may be required or permitted by Applicable Law. If Buyer does not furnish such certificates or the Transaction is subject to tax under Applicable Law, Buyer shall reimburse and indemnify Seller for all Taxes paid or incurred by Seller, together with all penalties and interest thereon.

12.3 Each Party shall provide to the other Party a properly executed IRS Form W-9, W-8BEN or W-8ECI (or successor form), as appropriate, upon the execution of a Confirmation and subsequently if the information in such form becomes materially inaccurate or such form expires or becomes obsolete. Each Party further agrees to promptly deliver to the other Party any other tax form or certificate reasonably requested by such other Party.

## 13. FORCE MAJEURE

13.1 Neither Party shall be liable to the other Party if it is rendered unable by an event of Force Majeure to perform in whole or in part any obligation or condition of a Transaction, for so long as the event of Force Majeure exists and to the extent that performance is hindered by the event of Force Majeure, provided, however, that the Party unable to perform shall use commercially reasonable efforts to avoid or remove the event of Force Majeure. During the period that a Party's performance of its obligations under any Transaction has been suspended in whole or part by reason of an event of Force Majeure, the other Party likewise may suspend the performance of all or part of its obligations related to such affected Transaction to the extent that such suspension is commercially reasonable, except for any payment and indemnification obligations arising prior to the occurrence of such Force Majeure event.

13.2 If either Party is rendered unable by Force Majeure to perform or comply fully or in part with any obligation or condition of a Transaction, the affected Party shall give written notice to the other Party of such Force Majeure event within 24 hours after receiving notice of the occurrence of the Force Majeure event relied upon, including, to the extent feasible, the details and the expected duration of the Force Majeure event and the volume of Product affected. Promptly thereafter, the Party rendered unable to

perform shall confirm such information in writing.  Such Party also shall promptly notify the other Party when the Force Majeure event is terminated.

13.3   In the event that the period of suspension due to a Force Majeure event as to an affected Transaction shall continue in excess of 30 days from the date that notice of such event is given, and so long as such event is continuing, either Party, in its sole discretion, may terminate such affected Transaction by written notice to the other Party, and neither Party shall have any further liability to the other Party in respect of such Transaction except for the rights and remedies previously accrued.

## 14.  SHORTAGE OF PRODUCT

If there is a shortage of Seller's supply of the quality and grade of Product sold pursuant to an affected Transaction such that Seller is unable to meet its requirements for its own use and for sales to its customers, Seller may allocate Product in good faith according to its discretion, but may not give preference to its own requirements and those of its Affiliates.  Under no circumstances shall Seller be obligated to acquire Product to replace supplies lost as a result of a shortage of Product.  Should Seller thereafter acquire additional Product of the same grade and quality, Seller shall not be required to allocate any such Product to Buyer.

## 15.  MATERIAL SAFETY DATA SHEETS

Seller has provided or shall provide Buyer in response to Buyer's request with Seller's Material Safety Data Sheets ("MSDS") for the Product delivered in any Transaction. Nothing in these GTCs shall excuse Buyer from complying with Applicable Law that may require Buyer to provide its employees, agents, contractors, users and customers who may come into contact with the Product with a copy of the MSDS and any other safety information provided to it by Seller, or that may require Buyer to ensure that the recommendations relating to the handling of the Product are followed.  Compliance with any recommendation contained in the MSDS or other safety information shall not excuse Buyer from complying with all Applicable Law.

## 16.  COMPLIANCE WITH LAW

16.1   **Fuels Regulations**.  Product sold under a Transaction shall be produced and delivered in full compliance with all Applicable Law, including environmental fuels regulations for (i) gasoline and alcohol blends, (ii) ultra low and low sulfur diesel, (iii) reformulated gasoline and RBOB, (iv) gasoline additives and (v) aviation fuel.  The failure of Product to conform to the requirements of Applicable Law shall excuse Buyer from further performance under the relevant Transaction and shall entitle Buyer to return the Product to Seller or take such other steps as are reasonably necessary to comply with Applicable Law.  RINs sold pursuant to any Transaction shall be transferred in full compliance with all Applicable Law.

16.2   **Recordkeeping**.  Seller and Buyer shall maintain appropriate records that demonstrate compliance with Applicable Law and industry standards.  Each Party also shall immediately notify the other Party in writing of any violation or alleged violation with respect to the Product and RINs (if any) sold in a Transaction and, upon reasonable request, shall provide the other with evidence of environmental inspections or audits by any Governmental Authority with respect to such Product or RINs.

16.3   **Gasoline and Alcohol Blends**.  For each delivery of gasoline and alcohol blends, Seller agrees to provide Buyer a certificate of analysis, a bill of lading, a delivery ticket or a loading ticket that represents the Product to be in compliance at the time of title

transfer and correctly stating the maximum Reid Vapor Pressure at the time of title transfer.

16.4 **Certified Distillate.** If the Product is a previously certified distillate, Seller represents that the Product has been designated as a previously certified distillate in accordance with the ULSD Regulations. Upon any transfer of custody or title by Seller with respect to the Product, Seller or its designee shall provide Buyer or Buyer's transferee with product transfer documents meeting the requirements of the ULSD Regulations and shall comply with all recordkeeping and reporting requirements. If the Product is a previously uncertified distillate, Seller represents, and Buyer acknowledges, that the Product has not been certified or designated as a distillate in accordance with the ULSD Regulations. In such case, Buyer acknowledges that it, or its consignee, is responsible for compliance with the requirements of the ULSD Regulations.

16.5 **Conventional Gasoline.** If the Product sold in any Transaction is conventional gasoline, Buyer acknowledges that such Product does not meet the requirements for reformulated gasoline and may not be used in any reformulated gasoline-covered areas. Seller agrees to provide Buyer with all product transfer documents required by Applicable Law.

16.6 **RBOB.** Seller and Buyer shall comply with all Applicable Law for reformulated gasoline and blendstocks, including regulations found at 40 CFR § 80.65 through to 80.89. Buyer agrees that pursuant to 40 CFR § 80.69(a)(5), the Product title may be transferred only to an oxygenate blender who is registered with the U.S. Environmental Protection Agency ("EPA") as such, or to an intermediate owner with the restriction that the Product shall only be transferred to a registered oxygenate blender. Pursuant to 40 CFR § 80.69(a)(6), Buyer hereby agrees to have a contract with the oxygenate blender, or a contract with an intermediate owner, that requires the intermediate owner to require the oxygenate blender to (or, if the oxygenate blender is Buyer, Buyer shall):

(a) blend Seller's RBOB with oxygenate in accordance with Seller's written instructions regarding the proper oxygenate type and amount of oxygenate;

(b) conduct quality assurance, sampling and testing as required in 40 CFR Part 80;

(c) stop selling any gasoline found to not comply with the standards under which the RBOB was produced or imported; and

(d) allow Seller to obtain samples of reformulated gasoline produced from Seller's RBOB subsequent to the addition of oxygenate and prior to combining the resulting gasoline with any other gasoline in accordance with 40 CFR Part 80.

16.7 **Ethanol.** In the event that the Product is ethanol and is imported into the United States, Buyer warrants and covenants that all ethanol purchased hereunder will be discharged from the Vessel into a permitted distilled spirits plant ("DSP") or an alcohol fuel plant ("AFP"), whether directly or via a U.S. Customs and Border Protection bonded warehouse. Upon discharge from the Vessel, the ethanol will not be taken to any other location other than a U.S. Customs and Border Protection bonded warehouse, DSP or AFP. If discharged into a U.S. Customs and Border Protection bonded warehouse, Buyer warrants that when the ethanol leaves such warehouse, it will be transferred from customs bond directly to a DSP or AFP. Buyer also warrants and covenants that it will comply with all Applicable Law administered by the U.S. Department of Treasury and Alcohol Tobacco Tax and Trade Bureau in connection with the handling, importation and discharge of the Cargo. If the ethanol is not discharged from the Vessel in accordance with this "Ethanol" provision or Buyer breaches this warranty and covenant

in any manner, Buyer shall indemnify, defend and hold Seller harmless from and against any and all losses, liabilities, claims, demands, damages, costs, expenses (including reasonable attorneys' fees), penalties, fines, fees and taxes (including any interest or penalties imposed thereon), as a result of Buyer's failure or breach.

16.8 **Sale or Transfer of RINs.**  Unless otherwise agreed, Seller shall separate and retain RINs from the Product to be supplied pursuant to the Confirmation, to the extent required or otherwise permitted by Applicable Law.  However, if RINs are sold or transferred, the following provisions apply:

(a) Each Party shall comply with the Renewable Fuel Standard Program as set forth in 40 CFR Part 80, and specifically §§ 80.1100 *et seq.* (the "Renewable Fuel Standard Regulations").  Seller and Buyer confirm that each has registered with EPA pursuant to the Renewable Fuel Standard Regulations, and in particular pursuant to 40 CFR § 80.1150, and has received an EPA-issued company identification number.  Further, Seller and Buyer acknowledge that registration under this regulation and the subsequent issuance of an EPA company identification number is required and necessary prior to engaging in any Transaction involving RINs. Buyer acknowledges that if it is not registered with EPA and does not have an EPA-issued company identification number, Seller will be unable to transfer any RINs under the relevant Transaction.

(b) Upon Seller's receipt of payment for RINs, Seller shall transfer to Buyer legal and equitable title to the RINs free and clear of any liens and encumbrances, and Buyer shall thereafter retain such title, right and interest in and to the RINs.  Seller shall provide Buyer with a certificate or other documentation evidencing the transfer of RINs.

(c) In addition to the rights and remedies specified in these GTCs, if Seller fails to transfer RINs to Buyer after Buyer has paid the full amount of the purchase price in accordance with the Transaction, Seller shall pay Buyer termination damages equal to (and not in excess of) the product of (i) the number of RINs that Seller was otherwise obligated to transfer to Buyer and (ii) the purchase price.  Alternatively, Seller, at its sole election, may timely deliver RINs of equal value and vintage year to cover the shortfall and shall transfer such RINs to Buyer pursuant to the terms hereunder.  If Buyer fails to pay Seller for the RINs in accordance with the Transaction and Seller elects to terminate the Transaction, Buyer shall pay Seller termination damages equal to (and not in excess of) the product of (i) the number of RINs that Buyer failed to pay for and (ii) the greater of (x) the purchase price and (y) the market price for one RIN (equivalent with respect to vintage year and delivery dates), determined by Seller in a reasonable manner, as of the early termination date declared by Seller.

16.9 **Octane Certification.**  In accordance with the Federal Trade Commission's requirements for octane certification under the Petroleum Marketing Practices Act, Seller certifies the accuracy of the octane rating of any automotive gasoline described in any Confirmation.

16.10 **California Export.**  For deliveries out of the State of California, Seller must retain documentation to support the delivery of fuel at an out-of-state location for all exemptions or credits.  Documentation may include contracts, bills of lading, delivery tickets, meter tickets or meter readings. Buyer has the burden and shall provide Seller with the proper substantiation and documentation to support the exemption or credit. Delivery tickets shall be furnished by Buyer to Seller's tax department within seven

days after the end of the month in which the Product was purchased showing receipt in a location outside of the State of California.

## 17. ISPS COMPLIANCE

17.1 **FOB Basis Transactions**. For FOB sales, Buyer warrants that the Vessel complies with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (the "ISPS Code") and the U.S. Maritime Transportation Security Act of 2002 ("MTSA"). Seller warrants that the loading port and loading terminal are in compliance with the ISPS Code and the MTSA.

17.2 **CIF/CFR and DES Basis Transactions**. For CIF/CFR and DES sales, Seller warrants that the Vessel complies with the requirements of the ISPS Code and the MTSA. Buyer warrants that the discharge port and discharge terminal are in compliance with the ISPS Code and the MTSA.

17.3 **Generally**. In all cases, a Party that breaches any warranty set forth in this "ISPS Compliance" section shall indemnify the other Party against any resulting delays, demurrage, expenses, fines, penalties or other costs (excluding any consequential or indirect damages).

## 18. NEW OR CHANGED REGULATIONS; ALTERNATIVE PRICE INDEX

18.1 If at any time after a Transaction is entered into new Applicable Laws are enacted or existing Applicable Laws are amended, which individually or collectively could reasonably be expected to have a material adverse effect upon the rights and obligations of a Party (the "Affected Party") as a whole under a particular Transaction (an "Affected Transaction") and which do not constitute a Force Majeure event, then the Affected Party may notify the other Party that it desires in good faith to renegotiate the price or other material terms or conditions so affected in order to appropriately pass through or otherwise address the effects of the new or changed Applicable Laws. Such notice shall state the new or changed Applicable Law upon which the Party's renegotiation request is based and the terms upon which it is willing to continue to perform the Transaction with respect to any Product not yet delivered. The Parties shall negotiate in good faith any price adjustments that may be warranted to account for any incremental costs involved in complying with a Governmental Authority's change in required Product specifications subsequent to the date of a nomination and prior to the commencement of the scheduled Delivery Period.

18.2 If the price of a Transaction is based on an industry reference index (the "Original Index") that ceases to be published or is not published for any period applicable to calculation of the price of the Transaction (in which case such Transaction will be deemed an Affected Transaction), the Parties shall in good faith (i) select an alternative index that reflects as nearly as possible the same information as published in the Original Index; or (ii) negotiate an interim price for the Transaction until the Original Index recommences publishing or an alternative index can be identified to replace the Original Index.

18.3 If the Parties do not agree upon new prices or terms satisfactory to both within 30 days of (i) a Party's request to initiate negotiations between the Parties pursuant to the first paragraph of this "New or Changed Regulations; Alternative Price Index" section or (ii) the failure of an Original Index to publish as described in the second paragraph of this "New or Changed Regulations; Alternative Price Index" section, as applicable,

either Party shall have the right to terminate all Affected Transactions that may legally be terminated at the end of the 30-day period, in which case each Party shall determine the Termination Payment that would be payable with respect to Affected Transactions as though it were the Performing Party in accordance with the "Termination and Liquidation" section. The Termination Payment payable with respect to Affected Transactions will be an amount equal to the sum of (i) one-half of the difference between the Termination Payments calculated by the two Parties, and (ii) the lesser of such two Termination Payments. Any Product delivered during the 30-day period shall be sold and purchased at the price and on the terms set forth in the Confirmation without any price adjustment in respect of the new or changed Applicable Law concerned.

## 19. DEFAULT

**19.1 Events of Default.** An "Event of Default" in respect of a Transaction shall be deemed to occur when:

(a) Either Party fails to make payment when due under any Transaction within one Business Day following receipt of a demand for payment by the other Party.

(b) Buyer (i) fails to satisfy the applicable credit and collateral requirements for any Transaction or provide Seller with acceptable Performance Assurance pursuant to the "Credit" section or such credit support or Performance Assurance expires, terminates or no longer is in full force and effect, or (ii) fails to provide credit support or further assurances of its performance under any Other Commodity Agreement, or collateral annex or credit support annex to any such Other Commodity Agreement within one Business Day following receipt of a demand therefor, or such other period as may be specified in the Other Commodity Agreement, collateral annex or credit support annex to such Other Commodity Agreement, or such credit support or further assurance expires, terminates or no longer is in full force and effect.

(c) Either Party fails to perform or repudiates any material obligation to the other Party under any Transaction (other than an Event of Default described elsewhere in this "Default" section) or breaches any representation, covenant or warranty in any material respect under any Transaction that, if capable of being cured, is not cured to the satisfaction of the other Party in its sole discretion, within two Business Days following receipt of notice by the defaulting Party that corrective action is needed.

(d) Either Party (i) fails to make payment when due under any Other Commodity Agreement within the cure period for payment defaults specified therein, or if no period is provided, within one Business Day following receipt of a demand for payment by the other Party or (ii) fails to perform or repudiates any material obligation to the other Party under any Other Commodity Agreement, or breaches any representation, covenant or warranty in any material respect under any Other Commodity Agreement, and such breach, if capable of being cured, is not cured to the satisfaction of the other Party in its sole discretion, within the cure period for such defaults specified therein, or if no period is provided, within five Business Days following receipt of notice by the Defaulting Party that corrective action is needed.

(e) Buyer or its Credit Support Provider under a Transaction or under any Other Commodity Agreement, (i) fails to satisfy, perform or comply with any agreement or obligation to be satisfied, complied with or performed by it in accordance with

the guaranty or credit support document issued in favor of Seller if such failure continues after any applicable grace or notice period, (ii) breaches any covenant which is not cured to Seller's satisfaction, in its sole discretion, within any applicable grace or notice period or any representation or warranty proves to be incorrect or misleading in any material respect when made under such guaranty or credit support agreement, or (iii) repudiates, disclaims, disaffirms or rejects, in whole or part, any obligation under such guaranty or credit support agreement or challenges the validity of such guaranty or credit support agreement.

(f)  A Designated Event occurs with respect to a Party, Buyer's Credit Support Provider, and the creditworthiness of the Party or Buyer's Credit Support Provider or, if applicable, the successor, surviving or transferee entity of such Party or Buyer's Credit Support Provider (as applicable) is materially weaker than that of the Party or Buyer's Credit Support Provider immediately prior to such Designated Event.

(g)  Either Party, Buyer's Credit Support Provider, or any of a Party's direct or indirect parent companies becomes or is Bankrupt.

(h)  A Letter of Credit Default occurs.

19.2  **Failure to Deliver or Accept Under Pipeline Transactions.**  Unless excused by an event of Force Majeure or the other Party's failure to perform, if a Party fails to deliver or accept all or part of the quantity of the Product as required in a particular pipeline Transaction during the applicable Delivery Period (the "Failing Party"), the Parties will negotiate in good faith to agree promptly to a resolution for such failure within two Business Days. If the Parties fail to agree to a resolution for the failure during the two-Business Day period, then the remedies described below in paragraph (a) and paragraph (b) will apply, which remedies shall be a Party's exclusive remedies for the other Party's failure to deliver or accept the Product as set forth in a Confirmation absent the Parties' agreement to different remedies.

(a)  Seller Failure to Deliver.  If Seller is the Failing Party, Seller shall pay to Buyer, on the date payment would otherwise be due in respect of the month in which the failure occurred, an amount for each Gallon/Barrel (as applicable) of the Product of such deficiency equal to (i) the market price at which Buyer, acting in a commercially reasonable manner, is able, or absent an actual purchase, would be able (FOB Delivery Location) to purchase or otherwise accept comparable supplies of the Product of comparable quality as determined by Buyer in a commercially reasonable manner, plus (1) costs reasonably incurred by Buyer in purchasing such substitute Product and (2) additional transportation charges, if any, reasonably incurred by Buyer as a result of taking delivery of substitute Product at a location other than the FOB Delivery Location, minus (ii) the price agreed to for the specific Transaction; except that if such difference is zero or negative, then neither Party shall have any obligation to make any deficiency payment to the other.

(b)  Buyer Failure to Accept Delivery.  If Buyer is the Failing Party, Buyer shall pay to Seller, on the date payment would otherwise be due in respect of the month in which the failure occurred, an amount for each Gallon/Barrel (as applicable) of the Product of such deficiency equal to (i) the price agreed to for the specific Transaction plus any storage, transportation or other costs reasonably incurred by Seller in reselling the Product minus (ii) the market price at which Seller, acting in a commercially reasonable manner, is able, or absent an actual sale, would be able (FOB Delivery Location), to sell or otherwise dispose of the Product as determined

by Seller in a commercially reasonable manner; except that if such difference is zero or negative, then neither Party shall have any obligation to make any deficiency payment to the other.

Failure to pay any amount due pursuant to paragraph (a) and paragraph (b) above will be deemed an Event of Default under this "Default" section if such failure is not cured within two Business Days following receipt of written notice of such failure from the other Party.

## 20. <u>TERMINATION AND LIQUIDATION</u>

20.1 Notwithstanding any provision of these GTCs, any Transaction, any Performance Assurance or any Other Commodity Agreement, if at any time an Event of Default has occurred and is continuing with respect to a Party, or, as to Buyer, also its Credit Support Provider or an Acceptable Letter of Credit Issuer (such Party, the "<u>Defaulting Party</u>"), the other Party (the "<u>Performing Party</u>") may, in its sole discretion, designate a date (an "<u>Early Termination Date</u>"), which is not earlier than the date of such notice and not later than 20 days after the date of such notice, on which to terminate, liquidate and accelerate all Transactions that may legally be terminated and calculate a Termination Payment (as defined below), or, to the extent that in the reasonable opinion of the Performing Party certain of such Transactions may not be liquidated and terminated under Applicable Law on the Early Termination Date, as soon thereafter as is reasonably practicable in which case the actual termination date for such Transactions will be the Early Termination Date in respect thereof for purposes of the second paragraph of this "Termination and Liquidation" section.

20.2 The Performing Party shall determine the final amount payable between the Parties as of the Early Termination Date (the "<u>Termination Payment</u>"), in the manner set forth in this paragraph and shall provide notice of the Termination Payment to the Defaulting Party. The Performing Party shall calculate the Termination Payment by (i) closing out each Transaction at its market value as reasonably determined by the Performing Party by determining the amount by which such then prevailing market value differs from the value specified in the Confirmation for such Transaction (it being understood that (x) in the event the prevailing market value exceeds the value specified in such Confirmation, the difference in value shall be due from Seller to Buyer, and (y) in the event that the prevailing market value is less than the value specified in such Confirmation, the difference in value shall be due from Buyer to Seller), (ii) determining any damages, costs or expenses resulting from the early termination of such Transactions, (iii) determining any other amounts owed by one Party to the other Party under such Transactions, (iv) determining any Other Termination Payment (as defined below) and (v) netting or aggregating the foregoing amounts to a single liquidated amount. The Performing Party shall notify the Defaulting Party of the Termination Payment due from or due to the Defaulting Party. The Performing Party may immediately, without notice to the Defaulting Party, realize against any Performance Assurance, credit support or collateral (including any cash deposit) provided by or on behalf of the Defaulting Party under any Transaction or any Other Commodity Agreement and apply the amount of any such Performance Assurance, credit support or collateral realized against in its calculation of the Termination Payment. If the Defaulting Party owes the Termination Payment to the Performing Party, the Defaulting Party shall pay the Termination Payment on the first Business Day after it receives the statement. If the Performing Party owes the Termination Payment to the Defaulting Party, the Performing Party shall pay the Termination Payment once it has reasonably determined

all amounts owed by the Defaulting Party to it under all Other Commodity Agreements and its rights of close-out and setoff under this "Termination and Liquidation" section.

20.3   The occurrence of an Early Termination Date or an Event of Default under any Transaction (except for the Event of Default described in paragraph (c) of the "Default" section) shall constitute a material breach and an event of default, howsoever described, under all Other Commodity Agreements, and the Performing Party may, by giving a notice to the Defaulting Party, designate an early termination date for all Other Commodity Agreements and, upon such designation, terminate, liquidate, accelerate, and otherwise close out all Other Commodity Agreements that lawfully may be closed out and terminated or, to the extent that in the reasonable opinion of the Performing Party certain of such Other Commodity Agreements may not be liquidated and terminated under Applicable Law on such early termination date, as soon thereafter as is reasonably practicable in which case the actual termination date for such Other Commodity Agreements will be the early termination date in respect thereof for purposes of the second paragraph of this "Termination and Liquidation" section. In such event, the Performing Party shall calculate the payments due upon early termination of such Other Commodity Agreements in accordance with the terms set forth in such Other Commodity Agreements, which shall be aggregated or netted to a single liquidated amount (the "Other Termination Payment") and paid pursuant to the terms of such agreements, or if no payment date is specified, on the payment date specified in the second paragraph of this "Termination and Liquidation" section. If a particular Other Commodity Agreement does not provide a method for determining what is owed upon early termination, then the amount due upon early termination shall be determined in the manner set forth in the second paragraph of this "Termination and Liquidation" section. In determining the Other Termination Payment, the Performing Party may foreclose upon and apply any collateral provided by or on behalf of the Defaulting Party under any Transaction or any Other Commodity Agreement.

20.4   If the Performing Party elects to designate an Early Termination Date under the first paragraph of this "Termination and Liquidation" section, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment (whether such Termination Payment is payable to the Performing Party or to the Defaulting Party) any amounts ("Other Amounts") payable under any agreements between the Defaulting Party and the Performing Party or between the Defaulting Party and any Affiliates of the Performing Party (whether or not arising under any Transaction, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation), including any Other Termination Payment determined pursuant to the third paragraph of this "Termination and Liquidation" section.   To the extent that the Termination Payment or any Other Amounts are so set off, the Termination Payment and Other Amounts will be discharged promptly and in all respects.   The Performing Party will give notice to the other Party of any set-off effected under this paragraph.

20.5   If the Defaulting Party is governed by a system of law that does not permit termination to take place after the occurrence of an Event of Default described in paragraph (g) of the "Default" section, then no prior notice shall be required upon the occurrence of such Event of Default, in which case the Early Termination Date shall be deemed designated immediately preceding the occurrence of such event.

20.6   The Performing Party's rights under this "Termination and Liquidation" section are in addition to, and not in limitation or exclusion of, any other rights of setoff, recoupment, combination of accounts, lien or other right which it may have, whether by agreement,

operation of law or otherwise. No delay or failure on the part of a Performing Party to exercise any right or remedy shall constitute an abandonment of such right or remedy and the Performing Party shall be entitled to exercise such right or remedy at any time after an Event of Default has occurred and is continuing. The Defaulting Party shall reimburse the Performing Party for its costs and expenses, including reasonable attorneys' fees, incurred in connection with the enforcement of, suing for or collecting any amounts payable by the Defaulting Party. The Defaulting Party shall indemnify and hold harmless the Performing Party for any damages, losses and expenses incurred by the Performing Party as a result of any Event of Default, including any damages, losses and expenses incurred in connection with the liquidation of hedges related to Product sold in any Transaction.

20.7   If (i) an Event of Default or (ii) an event that, with the lapse of time or the giving of notice or both, would constitute an Event of Default has occurred and is continuing, the Performing Party, upon written notice to the Defaulting Party, shall have the right to suspend performance under any Transaction.

20.8   The Parties intend that each Transaction shall constitute a forward contract under section 101(25) and a swap agreement under section 101(53B) of the Bankruptcy Code, protected by, *inter alia*, section 556 and section 560 of the Bankruptcy Code, that each Transaction and these GTCs constitutes a master netting agreement under section 101(38A) of the Bankruptcy Code, and that the rights in this "Termination and Liquidation" section include the rights referred to in section 561(a) of the Bankruptcy Code.

## 21. EFP

21.1   **EFP.** If a Transaction is part of an EFP transaction conducted in accordance with the rules of the New York Mercantile Exchange ("<u>NYMEX</u>"), Buyer shall sell and Seller shall buy a number of futures contracts for the specified Product and month provided in the terms of the Transaction equal to the volume to be delivered pursuant to the Transaction on a date to be mutually agreed by Buyer and Seller.

21.2   **Product Balancing.** The volumes sold and purchased by the Parties pursuant to the Transaction are intended to be equal. The Parties intend to post an EFP within 24 hours of receipt of notice of actual volume delivered. If the actual volume shipped differs from the number of NYMEX contracts sold/bought under an EFP by an amount greater than 1,000 Barrels, then the Parties shall balance the difference to the nearest 1,000 Barrels by posting (within the current month's NYMEX contract) an additional EFP for the amount. If the current month's NYMEX contract has expired at the time that the differing delivery occurs, the Parties shall post an additional EFP in the then current NYMEX month's contract plus or minus a differential to be calculated by taking the average of the spread between the expired month and the current month for the first three of the last four trading days of the expired month.

21.3   **Crude Balancing.** The volumes sold and purchased by the Parties pursuant to a Transaction are intended to be equal. If the actual volume shipped differs from the number of NYMEX contracts sold/bought under an EFP by an amount greater than 1,000 Barrels, then the Parties will balance the difference to the nearest 1,000 Barrels by posting (within the current month's NYMEX contract) an additional EFP for the amount. If the current month's NYMEX contract has expired at the time that the differing delivery occurs, the Parties will post the additional EFP within the next nearby month's NYMEX contract and the spread shall be a fixed number based on the

difference between the first month's settlement price and second month's settlement price on the date of Transaction or as specifically agreed to by both Parties in the pricing provision of the Confirmation.

## 22. REPRESENTATIONS AND WARRANTIES

22.1   Each Party represents and warrants to the other Party, as of each Trade Date, that:

(a)   it is (i) an "eligible commercial entity" and an "eligible contract participant" as defined in sections 1a(11) and 1a(12) of the Commodity Exchange Act, as amended, and (ii) a "forward contract merchant" under section 101(26) and "master netting agreement participant" under section 101(38B), for purposes of the Bankruptcy Code.

(b)   it has the corporate, governmental or other legal capacity, authority and power to execute, deliver and perform each Transaction, and has taken all necessary action to duly authorize the foregoing.

(c)   its obligations under the relevant Transaction constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application regardless of whether enforcement is sought in a proceeding in equity or at law).

22.2   Seller represents and warrants to Buyer that, as of the date of delivery of Product under any Transaction, it has marketable title to the Product sold and delivered pursuant to such Transaction, free and clear of any liens or encumbrances, and that it has full right and authority to transfer such title and effect delivery of such Product to Buyer.

## 23. INDEMNITY

Each Party (the "Indemnifying Party") agrees to protect, defend, indemnify and hold the other Party (the "Indemnified Party") harmless from and against any and all claims, demands, suits, losses, expenses (including reasonable attorneys' fees), damages, fines, penalties, causes of action and liabilities of every type and character, including personal injury or death to any Person or loss or damage to any personal or real property, caused by or directly or indirectly arising out of or resulting from the Indemnifying Party's breach of any Transaction, negligence or failure to comply with Applicable Law with respect to the sale, transportation, storage, handling or disposal of the Product or the purchase or sale and transfer of any RINs, unless such liability results from the Indemnified Party's negligence or willful misconduct. In the event the Parties jointly or concurrently engage in negligent or willful misconduct, each Party shall indemnify the other Party to the extent of its negligent acts or omissions or willful misconduct. Each Party agrees to notify the other Party as soon as practicable after receiving notice of any suit brought against it within this indemnity, shall furnish to the other Party the complete details within its knowledge and shall render all reasonable assistance requested by the other Party in the defense. Each Party shall have the right but not the duty to participate, at its own expense, with counsel of its own selection, in the defense and settlement thereof without relieving the other of any obligations under this 'Indemnity" section. The mere purchase and existence of insurance does not reduce or release either Party from any liability incurred or assumed under any Transaction.

## 24. ASSIGNMENT

A Party may not assign its obligations in whole or in part under any Transaction without the prior written consent of the other Party. Further, unless otherwise provided in such consent, the assignor shall be jointly and severally held responsible with the assignee for the full performance of the assignor's obligations. Each Transaction shall inure to the benefit of and be binding upon the Parties, their respective successors and permitted assigns.

## 25. GOVERNING LAW; JURISDICTION

25.1 Each Transaction and all matters arising in connection therewith, including validity and enforcement, shall be governed by, interpreted and construed in accordance with the laws of the State of New York, without giving effect to its conflicts of laws principles that would result in the application of a different law. Each Party hereby submits itself to the exclusive jurisdiction of any federal court of competent jurisdiction situated in the Borough of Manhattan, State of New York or, if any federal court declines to exercise or does not have jurisdiction, in any New York state court in the Borough of Manhattan, State of New York and to service of process by certified mail, delivered to the Party at its last designated address. Each Party hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection to the jurisdiction of any such court or to the venue therein or any claim of inconvenient forum of such court. Each Party waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any proceedings relating to any Transaction. Each Party irrevocably agrees to designate any proceeding relating to a Transaction brought in the courts of the State of New York as "commercial" on the request for judicial intervention seeking assignment to the commercial division of the Supreme Court of the State of New York.

25.2 The United Nations Convention on Contracts for the International Sale of Goods 1980 shall not in any way apply to or govern any Transaction.

## 26. LIMITATION OF LIABILITY

THE PARTIES' LIABILITY FOR DAMAGES UNDER ANY TRANSACTION IS LIMITED TO DIRECT, ACTUAL DAMAGES ONLY AND NEITHER PARTY SHALL BE LIABLE FOR SPECIFIC PERFORMANCE, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, LOSS OF USE OR SERVICE OR OF CAPITAL, OR CLAIMS OF CUSTOMERS OF THE OTHER PARTY, OR SPECIAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, IN TORT, CONTRACT OR OTHERWISE, OF ANY KIND, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE PERFORMANCE, THE SUSPENSION OF PERFORMANCE, THE FAILURE TO PERFORM OR THE TERMINATION OF A TRANSACTION. EACH PARTY ACKNOWLEDGES THE DUTY TO MITIGATE DAMAGES.

## 27. NOTICES

All notices, invoices and other communications under any Transaction shall be in writing and sent by e-mail or other electronic transmission, facsimile, overnight courier, hand, registered or certified mail, return receipt requested with all postage fully paid; provided, however, that notices issued pursuant to the "Default" section and the "Termination and Liquidation" section shall not be sent by e-mail or other electronic transmission. A Party may change its address or facsimile number by giving notice in accordance with this "Notices" section. Except as provided in the "Payment" section as to invoices, a notice shall be deemed to have been received by a Party (i) if delivered by hand or sent by overnight courier, on the day of

delivery if a Business Day, or if not a Business Day, on the immediately following Business Day, (ii) if sent by registered or certified mail, return receipt requested, on the date of receipt, and (iii) if transmitted by facsimile, at the time of transmission with answer back confirmation of receipt.

## 28. MISCELLANEOUS

**28.1 Delivery Terms.** FOB/DES/CIF/CFR and CIF/CFR (outturn quality and quantity) shall have the meaning ascribed thereto in Incoterms 2000 except as modified by the Confirmation. If there is any inconsistency or conflict between the Incoterms and the Confirmation, the Confirmation shall prevail.

**28.2 Entire Agreement.** The special terms as set forth in a Confirmation and these GTCs form the Parties' entire agreement as to a particular Transaction. A Confirmation or Transaction shall not be modified, amended or supplemented unless mutually agreed by the Parties, which agreement must be evidenced in writing. Nothing in these GTCs shall limit, impair or contravene the Parties' or their Affiliates' rights as set forth in any other agreement between the Parties or their Affiliates (whether entered into prior to, on or after the effective date of any Transaction) regarding the collection and determination of margin and collateral, the exporting or importing of events of default or termination events, or the netting and setting off of amounts due.

**28.3 MTBE Sales.**

(a) Buyer represents and warrants to Seller that it is purchasing the MTBE for the sole purpose of exporting it from the United States. Buyer agrees that it shall not (i) resell or otherwise transfer any portion of the MTBE sold under a Transaction to any destination in the District of Columbia or any state, territory or possession of the United States (collectively, the "United States") in any manner whatsoever or (ii) use such MTBE to blend, refine or otherwise produce any product that it would use in, or transport to, the United States and agrees that Buyer shall not otherwise take any action of any kind to introduce such MTBE or any product containing such MTBE into commerce in the United States.

(b) Buyer agrees to indemnify, defend and hold Seller and any of its officers, directors, managers, employees, consultants, agents and representatives (each, a "Morgan Stanley indemnified party") harmless from and against any and all losses, liabilities, claims, demands, damages, costs, expenses (including reasonable attorneys' fees) and money judgments incurred by or rendered against a Morgan Stanley indemnified party based upon or in connection with any breach by Buyer of its obligations under the preceding paragraph (a) of this "MTBE Sales" section.

(c) The indemnity and other obligations set forth in the two immediately preceding paragraphs of this "MTBE Sales" section shall survive performance of the relevant Transaction.

**28.4 GPA Standards.** Unless otherwise specified in a Confirmation, all LPGs and NGLs shall comply with the specifications of the Gas Processors Association of the United States ("GPA") in effect at the time of delivery of Product. All measurement, sampling and analysis of LPGs and NGLs shall be conducted in accordance with all applicable GPA, API and ASTM standards then in effect.

**28.5 No Third Party Beneficiaries.** Nothing expressed or implied in these GTCs is intended to create any rights, interests, obligations or benefits under any Transaction in

any Person other than Buyer, Seller and their respective successors and permitted assigns.

**28.6** <u>**Non-Waiver.**</u>  No waiver by either Party of any breach by the other Party of any of the covenants, conditions or other terms of any Transaction shall be construed as a waiver of any succeeding breach of the same or of any other covenant, condition or any other term of such Transaction or any other Transaction.

**28.7** <u>**Right to Audit.**</u>  Each Party shall accord the other the right to inspect the other Party's terminal and transportation facilities, during regular business hours and at the expense of the Party conducting the inspection, for the purpose of verifying compliance with a Transaction, and in accordance with Applicable Law.  Each Party and its authorized representative shall have access to the books and records of the other Party relating to performance of the Transaction. Each Party shall have the right to audit those records at any reasonable time, but not more than two times per year, during the term of any term Transaction and for two years thereafter.  The audited Party shall fully cooperate with the auditing Party to accomplish the audit as expeditiously as possible.  Either Party may retain outside auditors or inspectors whose costs and fees shall be borne by the Party employing the outside auditor or inspector.  Each Party agrees to be bound and shall cause any independent auditors or inspectors to be bound by the confidentiality obligations contained herein.  Either Party may witness any inspection at its own expense.

**28.8** <u>**Survival.**</u>  Cancellation, expiration or termination of any Transaction shall not relieve the Parties of any obligations that, by their very nature, must survive said cancellation, expiration or termination, including all payment and indemnification obligations arising under any Transaction and these GTCs prior to the date of cancellation, expiration or termination.   A Party's payment obligation shall not be deemed fulfilled until the payment has been credited in full into the other Party's bank account.

## EXHIBIT A

### Letter of Indemnity
-------------------------------------

We refer to our Agreement dated xxxx in respect of your purchase from us of xxxxx net U.S. barrels of xxxxx delivered on vessel xxxxx bill of lading dated xxxxx.  Bill of lading volume U.S. barrels xxxxx.

In consideration of your making payment of USD  xxxxx for xxxxx net U.S. barrels of the said xxxxx in accordance with the Agreement and having agreed to accept delivery of the cargo in question without having been provided with the full set(s) of 2/3 original, clean negotiable bills of lading issued or endorsed to the order of xxxxx /owner's receipt for 1/3 original, clean negotiable bills of lading /original certificate(s) of quantity and quality/original certificate(s) of origin and authenticity (the "documents") we hereby represent and warrant the existence and validity of the documents, that we are entitled to possession of the documents, we were entitled to possession of the xxxxx, we had good title to such xxxxx, and that title in the xxxxx has been passed as provided in the Agreement to you free of all liens, charges or encumbrances of whatever kind and you will have the benefit of the warranty as to enjoyment of quiet possession implied by law in the Agreement but without prejudice to any other warranty so implied.

Without prejudice to your rights under the Agreement we hereby agree to protect, indemnify and hold you harmless from and against any and all damages, losses, liabilities, costs, claims and reasonable expenses which you may suffer by reason of:

a) our failure to present to you in accordance with the Agreement the documents,

and/or

b) any action or proceeding brought or threatened against you in connection with questions of title to or the right to possession of the documents or the cargo or the proceeds of either, or any liens, charges or encumbrances asserted on the documents or the cargo or any other claims arising out of or in connection with the documents.

This Letter of Indemnity shall be governed by and construed in accordance with New York law, shall be subject to the exclusive jurisdiction of the New York courts and shall cease to have effect upon the documents being provided to you in good order except for any claim made against Buyer prior to presentation of documents.

Regards,

EXHIBIT B

**FORM OF**

**IRREVOCABLE STANDBY LETTER OF CREDIT**

**LETTER OF CREDIT NO.** _____

**DATE OF ISSUANCE:** _____

**EXPIRY DATE:** _____

**Morgan Stanley Capital Group Inc.**

**2000 Westchester Avenue**

**Purchase, NY 10577**

**ATT: Commodities Physical Oil Traffic Department**

**Re: Credit No.** _____

**Morgan Stanley Contract:** _____

**Product:** _____

**Volume (including tolerance):** _____

**Price:**                    **[insert the fixed or formula price]**

(1)   We hereby establish our Irrevocable Standby Letter of Credit for the account of _____ (the "Account Party"), for [Insert Amount in Words] United States Dollars ($[Insert Amount in Numbers]) in favor of Morgan Stanley Capital Group Inc., ("Beneficiary") available to you at sight upon demand at our counters at [Insert Location] on or before the Expiry Date (as defined below) against presentation to us of the following statements, dated and signed by a representative of the Beneficiary.

"Account Party has failed to make a payment ("Unpaid Amount") owed pursuant to an agreement between the Beneficiary and Account Party for the purchase and sale of [Insert Quantity & Name of Product] dated as of [Insert Date], as the same may be amended, and such Unpaid Amount remains unpaid at the time of drawing hereunder.  Wherefore, the undersigned does hereby demand payment of [Insert Amount in Words] United States Dollars ($[Insert Amount in Numbers]) under the Letter of Credit."

(2)   This Letter of Credit shall expire at our counters on [Insert Date] at 5:00 pm local time in the city of the location where documents are to be presented (the "Expiry Date").

(3)   Partial and multiple drawings [and/or shipments] are permitted hereunder.

(4)   The amount which may be drawn by you under this Letter of Credit shall be automatically reduced by (i) the amount of any amounts paid by us under this Letter of Credit [and (ii) the amount of any payment made outside this Letter of Credit to you, provided such payment is made by us and reference is made to this Letter of Credit].

(5)   All costs and banking charges pertaining to this Letter of Credit are for the account of the Account Party.  Failure of the Account Party to pay any such amounts shall not affect your rights to make drawings under this Letter of Credit.

(6)   We hereby agree with you that draw requests presented under and in compliance with the terms of this Letter of Credit shall be duly honored and paid in immediately available funds as specified herein.

(7)   If demand for payment is made by you hereunder on a Business Day on or prior to 4:00 pm, in the city of the location where documents are to be presented, and your drawing certificate conforms to the terms and conditions hereof, payment shall be

made to you on the next immediately succeeding Business Day. If demand for payment is made by you hereunder on a Business Day after 4:00 pm, time in the city of the location where documents are to be presented, and your drawing certificate conforms to the terms and conditions hereof, payment shall be made to you on the second immediately succeeding Business Day. As used herein the term "Business Day" means (a) a day on which we (at our above address) are open for the purpose of conducting a commercial banking business and (b) a day on which banking institutions in New York, New York, generally are open for the purpose of conducting a commercial banking business.

(8)     Any notice, demand, draw request or other communication hereunder shall be delivered by hand, by nationally recognized overnight courier, by telex or by facsimile to:

_____

_____

_____

Attention: _____

Telecopier No.: _____

(9)     This Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision), ICC Publication No. 600 ("UCP"), except to the extent that the terms hereof are inconsistent with the provisions of the UCP, in which case the terms of this Letter of Credit shall govern. As to matters not covered by the UCP and to the extent not inconsistent with the terms hereof, this Letter of Credit shall be governed by and construed in accordance with the law of the State of New York, including Article 5 of the Uniform Commercial Code as in effect in that State.

or

        This Letter of Credit shall be governed by the International Standby Practices (ISP98), International Chamber of Commerce Publication No. 590 ("ISP"), except to the extent that the terms hereof are inconsistent with the provisions of the ISP, in which case the terms of this Letter of Credit shall govern. As to matters not covered by the ISP and to the extent not inconsistent with the terms hereof, this Letter of Credit shall be governed by and construed in accordance

with the law of the State of New York, including Article 5 of the Uniform Commercial Code as in effect in that State.

(10)   In the event of an Act of God, riot, civil commotion, insurrection, war or any other cause beyond our control that interrupts our business and causes the place for presentation of this Letter of Credit to be closed for business on the last day for presentation, the expiry date of this Letter of Credit will be automatically extended without amendment to a date thirty (30) calendar days after the place for presentation reopens for business.

[BANK SIGNATURE]

**Morgan Stanley**

**MORGAN STANLEY CAPITAL GROUP INC.**
*2000 WESTCHESTER AVENUE / FLOOR 01*
*PURCHASE, NEW YORK 10577-2530*

May 24, 2011

*VIA EMAIL AND COURIER*

Mr. Ron Moyes
Swift Refining Company, LLC
5301 N. 16th Street
Phoenix, AZ 85016

Re:     Notice of Default under the Confirmation Morgan Contract No.: 76201986 related
        to the Purchase and Sale of Conventional Blend Stock for Oxygenate Blending
        dated May 12, 2011, as amended (the "Contract") by and between Morgan
        Stanley Capital Group Inc. (referred to herein as "Morgan Stanley" or "Seller")
        and Swift Refining Company, LLC (referred to herein as "Swift" or "Buyer").

Dear Mr. Moyes,

We write in reference to the above referenced Contract.  Capitalized terms used herein
but not otherwise defined shall have the meanings ascribed to them in the Contract.

Regrettably, Swift has repeatedly failed to make the provisional and final payments due
under the Contract.  Specifically, the Contract required Swift to: (1) make prepayment in
advance of discharge of the Cargo and upon presentation of a provisional invoice, on
May 12, 2011; and (2) make a final payment on May 16, 2011.  Morgan Stanley
subsequently extended the prepayment deadline by emails dated May 12 and May 13,
2011, and made formal demand for payment by letter dated May 20, 2011.
Notwithstanding these efforts, Swift has yet to remit payment as required under the
Contract and the Cargo remains onboard the vessel Seavictory at the port of Rio Haina,
Dominican Republic.

Pursuant to Section 19.1(a) of the Contract's General Terms and Conditions that are
incorporated therein by reference, the failure to make any payment when due under any
Transaction within one Business Day following receipt of demand for payment results in
an Event of Default.  Consequently, Swift's failure to remit the provisional payment on
May 23, 2011, and failure to remit the final payment on May 24, 2011, basis the New
York Mercantile Exchange (NYMEX) Settlement Price for June 2011 RBOB plus USD
0.10 per gallon, constitutes an Event of Default under the Contract, that is continuing to
and through the date of this letter.

# Morgan Stanley

**MORGAN STANLEY CAPITAL GROUP INC.**
*2000 WESTCHESTER AVENUE | FLOOR 01*
*PURCHASE, NEW YORK  10577-2530*

Pursuant to the Contract, Swift must indemnify and hold harmless Morgan Stanley for all liabilities directly or indirectly incurred as a result of an Event of Default or in Morgan Stanley's exercise of any remedies under the Contract.  Morgan Stanley is unable to determine or ascertain the amount of such liabilities at this time.

Morgan Stanley continues to reserve all of its rights and remedies provided at law, in equity, under the Contract and any other agreements between Morgan Stanley and Swift, including the right to terminate the Contract as a result of this Event of Default and any rights or remedies that may arise as a result of any intervening event.

Very truly yours,

Morgan Stanley Capital Group Inc.


By:  _____
     Nancy King
     Vice President

# EXHIBIT B

**Morgan Stanley**

*MORGAN STANLEY CAPITAL GROUP INC.*
*2000 WESTCHESTER AVENUE | FLOOR 01*
*PURCHASE, NEW YORK 10577-2530*

May 26, 2011

***VIA EMAIL AND COURIER***

Mr. Ron Moyes
Swift Refining Company, LLC
5301 N. 16th Street
Phoenix, AZ 85016

Re:    Notice of Early Termination under the Confirmation Morgan Contract No.:
       76201986 related to the Purchase and Sale of Conventional Blend Stock for
       Oxygenate Blending dated May 12, 2011, as amended (the "Contract") by and
       between Morgan Stanley Capital Group Inc. (referred to herein as "Morgan
       Stanley" or "Seller") and Swift Refining Company, LLC (referred to herein as
       "Swift" or "Buyer").

Dear Mr. Moyes,

We write in reference to the above referenced Contract. Capitalized terms used herein
but not otherwise defined shall have the meanings ascribed to them in the Contract.

As notified in our letter of May 24, 2011, Swift's failure to timely pay or otherwise
perform constitutes an Event of Default under the Contract. Such default is continuing to
and through this letter. As such, this letter hereby notifies Swift that Morgan Stanley is
exercising its right, pursuant to Section 20.1 of the General Terms and Conditions
("GTCs") incorporated in the Contract, to terminate the Contract as of the date of this
letter (the "Early Termination Date").

As provided in Section 20.2 of the Contract's GTCs, the Performing Party shall
determine the amount payable between the Parties (the "Termination Payment"). The
currently estimated amount of the Termination Payment is in excess of $4,700,000.00.
Additional liabilities, costs and expenses, including but not limited to the change in
prevailing market value of the Product, demurrage and other vessel expenses, storage
fees, attorneys' fees, and broker fees (if any), are not yet determined. Morgan Stanley
will notify Swift of the final amount of the Termination Payment as soon as reasonably
and commercially possible. We remind Swift of its obligation to indemnify and hold
harmless Morgan Stanley for all liabilities directly or indirectly incurred as a result of an
Event of Default or in Morgan Stanley's exercise of any remedies under the Contract.

1

# Morgan Stanley

**MORGAN STANLEY CAPITAL GROUP INC.**
2000 WESTCHESTER AVENUE | FLOOR 01
PURCHASE, NEW YORK  10577-2530

We are retaining counsel in anticipation of possible litigation concerning this matter and intend to pursue all possible remedies, including but not limited to pursuing appropriate compensation against the assets of all members, shareholders, affiliates and parent companies of Swift.

Morgan Stanley continues to reserve all of its rights and remedies provided at law, in equity, under the Contract and any other agreements between Morgan Stanley and Swift, including any rights or remedies that may arise as a result of any intervening event.

Very truly yours,

Morgan Stanley Capital Group Inc.


By:

Deborah Hart
Vice President

2

# EXHIBIT C

# Morgan Stanley

*MORGAN STANLEY CAPITAL GROUP INC.*
*2000 WESTCHESTER AVENUE | FLOOR 01*
*PURCHASE, NEW YORK 10577-2530*

September 23, 2011

**BY EMAIL AND COURIER**

Mr. Ron Moyes
Swift Refining Company, LLC
5301 N. 16th Street
Phoenix, AZ 85016

Re:     Notice of Termination Payment under the Confirmation Morgan Contract No.: 76201986
related to the Purchase and Sale of Conventional Blend Stock for Oxygenate Blending
dated May 12, 2011, as amended (the "Contract") by and between Morgan Stanley
Capital Group Inc. (referred to herein as "Morgan Stanley" or "Seller") and Swift
Refining Company, LLC (referred to herein as "Swift" or "Buyer").

Dear Mr. Moyes:

We write concerning to the above-referenced Contract.  (Capitalized terms used herein have the
meanings ascribed to them in the Contract.)  We also refer to our Notice of Early Termination
letter of May 26, 2011.

This letter constitutes Notice of Termination Payment owed by Swift to Morgan Stanley as
provided in Section 20.2 of the Contract's General Terms and Conditions.  The total amount
owed by Swift as a Termination Payment amounts to the sum of $4,920,628.72 which is
immediately due and payable.  This amount is comprised of the following components:

(a)     The sum of $4,132,610.48 as the amount by which the value of product sold to Swift at
prevailing market at the time of Termination differs from the value specified in the
Confirmation, as reasonably determined by Morgan Stanley.  No liquid market for this
product exists in the Dominican Republic so the value must be calculated as at and after
arrival at Port Everglades, Florida which is where the cargo was taken following Swift's
Default.  Morgan Stanley discharged a total of 137,789.28 barrels of the cargo into its
own available storage at Port Everglades and Cape Canaveral.  Morgan Stanley used the
entirety of storage space available to it.  The value for that portion of the cargo is
determined based on a standard differential from posted prices for the three days
surrounding discharge.  CBOB delivered to Florida is priced on average as a 5.25 cpg
premium to Colonial Pipeline A grade for the reference period.  Morgan Stanley was able
to sell the remaining volume of 185,622.40 barrels inside Customs to Vitol Inc. at Vitol's
facility in Cape Canaveral at July NYMEX less 10 cpg.  Damages are based on the

Mr. Ron Moyes
September 23, 2011
Page 2

differential between the contract price to Swift and the amount received from Vitol Inc. for this portion of the cargo. The details of the calculation are set forth on Attachment 1 to this letter.

(b)     The amount of $788,018.24 representing damages, costs and/or expenses resulting from the Early Termination of the Contract as set forth on Attachment 2 to this letter. These include the cost of vessel freight to Florida, governmental duties and fees, demurrage, and other costs and expenses. The cargo was sold to Swift basis DES, Ex-duty Dominican Republic. After default by Swift, Morgan Stanley had to bring the cargo to and discharge it in the U.S. and thus incurred customs duties, RIN costs, spill fees and other expenses which Morgan Stanley would not have had to pay on the contract sale to Swift. All are owed by Swift as provided in Section 20.2 of the applicable General Terms and Conditions of the Contract.

Under the terms of the Contract, Swift is obliged to pay the Termination Payment on the first business day following your receipt of this statement. In the event that payment is not timely made, Morgan Stanley shall pursue all available remedies in the appropriate forum against all responsible parties and individuals.

Morgan Stanley continues to reserve all of its rights and remedies provided in law, in equity, under the Contract and any other agreements between Morgan Stanley and Swift including any rights or remedies that may arise as a result of any intervening event. None of its rights and remedies are hereby waived.

Very truly yours,

Morgan Stanley Capital Group Inc.

By: _____
        Kenneth Carlino
        Vice President

Attachments

13279425.1

Morgan Stanley Capital Group Inc.
Notice of Termination Payment (September 23, 2011)

Attachment 1

**Actual discharge date to MS Storage, Fla. - 137,789.28 bbls.**

| | | Date | Quote | Value | | |
|---|---|---|---|---|---|---|
| 6/2/11 CBOBAPLGCPSUPP | 2.8156 | 6/2/11 | RBNY11N | 2.9677 | | -0.1521 |
| 6/3/11 CBOBAPLGCPSUPP | 2.8394 | 6/3/11 | RBNY11N | 2.9931 | | -0.1537 |
| 6/6/11 CBOBAPLGCPSUPP | 2.7716 | 6/6/11 | RBNY11N | 2.9499 | | -0.1783 |
| 6/6/11 CBOBAPLGCPSUPP | 2.8089 | | | 2.9702 | | -0.1614 |
| | | | | avg | | 0.1089 |
| | | | | 5.25cpg adder | | -0.1000 |
| | | | | swift | | -0.1001 |
| | | | | jun/jul roll | | -0.3090 |
| | | | | diff | | |
| | | | | damages | | 1,788,229.28 |

**Actual discharge sale to vitol - 185,863.04 bbls.**

| | | |
|---|---|---|
| sale to swift | june+10cpg ex | |
| sale to vitol | jul-10cpg inside | |
| jun/jul roll | 10.01cpg | 0.3001 |
| diff | | |
| damages | | 2,344,381.20 |

Total difference, volume to storage and vitol sale     4,132,610.48

**Morgan Stanley Capital Group Inc.**                                    **Attachment 2**
**Notice of Termination Payment (September 23, 2011)**

| Seavictory | | Value | |
|---|---|---|---|
| Inspection Costs | Camin (ptev) | $ | 7,120.00 |
| (Note A) | Camin (cape) | $ | 6,230.00 |
| | Camin PTEV Handblends and Post Discharge | $ | 1,905.00 |
| | Camin (Nace) | $ | 4,154.62 |
| | SGS (Discharge Vitol Cape Canaveral) | $ | 1,054.27 |
| | | $ | 20,463.89 |
| Port Costs | South FLA | $ | 2,391.80 |
| (Note B) | South FLA | $ | 1,456.29 |
| | South FLA | $ | 1,529.00 |
| | Dock Security - Cape Canaveral | $ | 663.03 |
| | Dock Watch - Steves Business Cape | $ | 618.75 |
| | | $ | 6,658.87 |
| Duties | Charter (Cape) | $ | 129,959.88 |
| (Note C) | Charter (Cape) | $ | 55,661.93 |
| | Charter (PTEV) | $ | 39,789.91 |
| | | $ | 225,411.72 |
| RINs/RVO | 1.25 cpg costs basis for total 324,000 bbls | $ | 170,100.00 |
| (Note C) | | | |
| | | $ | 170,100.00 |
| IRS Spill Fee | Port Everglades | $ | 4,578.31 |
| (Note D) | Cape Canaveral (vitol) | $ | 14,850.00 |
| | Cape Canaveral | $ | 6,444.83 |
| | | $ | 25,873.14 |
| Wharfage | Port Everglades | $ | 9,711.74 |
| (Note B) | Cape Canaveral | $ | 8,700.52 |
| | | $ | 18,412.26 |
| Demurrage | FLA Discharge | $ | 69,349.31 |
| Freight | Dominican Republic to Florida | $ | 31,422.20 |
| Demurrage | Waiting Time Dominican Republic | $ | 220,326.84 |
| | | $ | 321,098.35 |

TOTAL Additional Cost                                    $    788,018.24

A. Reflects one half of total inspection costs.  Under Agreement, Swift and MSCG split costs.  Amounts represent additional expenses incurred by MSCG due to Swift default.

B. Under Agreement, Swift is responsible for all port costs.  Therefore, all port costs are additional expenses incurred by MSCG due to Swift default.  MSCG would not have had these expenses if cargo discharged in Dominican Republic.

C. All duties and RIN expenses are additional expenses on the cargo incurred by MSCG due to Swift default.  MSCG would not have had these expenses if cargo discharged in Dominican Republic.

D. All spill fees are additional expenses on the cargo incurred by MSCG due to the Swift default.  MSCG would not have had these expenses if cargo discharged in Dominican Republic.